# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

JANE DOE

VERSUS

BOARD OF SUPERVISORS OF
THE UNIVERSITY OF LOUISIANA
SYSTEM, ET AL.

CIVIL ACTION

NO. 22-00338-BAJ-SDJ

## RULING AND ORDER

Plaintiff was raped in September 2018, when she was a student at Louisiana Tech University. Her attacker—known to her only as "Daniel"—was also a Tech student, having recently transferred from University of Louisiana Lafayette ("UL Lafayette"). At the time, Plaintiff did not know that "Daniel" was a sexual predator who had been reported for rape and other sexual misconduct on five prior occasions.

Allegedly, however, the Defendants knew "Daniel's" identity—Victor Daniel Silva—*and* his past. The Board of Supervisors of Louisiana State University and Agricultural and Mechanical College ("LSU") allegedly knew of Silva because Silva began his college career at LSU, and was banned from LSU's Baton Rouge campus after two female LSU students separately reported him for rape.

The Board of Supervisors of the University of Louisiana System ("ULS")—which supervises both UL Lafayette and Louisiana Tech—allegedly knew of Silva because after his stint at LSU, Silva transferred repeatedly between UL Lafayette and Tech, and was placed on academic probation after he was arrested for rape.

The Lafayette City-Parish Consolidated Government ("LCG") allegedly knew of Silva because during Silva's time at UL Lafayette, three separate women—two UL

Lafayette students and one local community college student—reported him for sex crimes to the Lafayette Police Department ("Lafayette PD" or "LPD").

Federal law requires publicly-funded universities to immediately and effectively investigate reports of sexual assault to eliminate the threat and prevent its reoccurrence. Louisiana law requires coordinated intervention among public universities and local law enforcement to identify and remove sexual offenders from college campuses. Yet, despite five alleged assaults, a rape arrest, and banishment from LSU, Silva was not suspended, expelled, criminally prosecuted, or even meaningfully investigated. Instead, in the face of new allegations, Silva was allowed to transfer repeatedly among LSU, UL Lafayette, and Louisiana Tech. Even *after* Plaintiff reported her rape to Louisiana Tech—Silva's *sixth* alleged assault—Silva transferred back to UL Lafayette and graduated with a clean academic record.

Defendants' knowledge of Silva came to light for the first time in May 2021, when USA Today published a damning article detailing Silva's predatory sexual misconduct and Defendants' failure to respond to the same.[1] One year later, Plaintiff filed this lawsuit alleging violations of Title IX of the Education Amendments of 1972, 20 U.S.C § 1681, and negligence. Now LSU, ULS, and LCG each move to dismiss Plaintiff's claims, arguing that they are implausible, untimely, or otherwise not actionable. (Doc. 22, Doc. 23, Doc. 40). Plaintiff opposes Defendants' Motions. (Doc. 24, Doc. 31, Doc. 41). For reasons set forth below, LSU's Motion must be granted

---

[1] *See* Kenny Jacoby, *Six Women Reported A Louisiana College Student For Sexual Misconduct. No One Connected The Dots.*, USA TODAY (May 26, 2021), *available at*: https://www.usatoday.com/in-depth/news/investigations/2021/05/26/louisiana-officials-skirted-law-meant-curb-campus-sex-crimes/7048845002/ (viewed Dec. 28, 2022).

because the Eleventh Amendment requires Plaintiff to pursue her state law negligence claim against LSU in state court, not here. ULS's Motion and LCG's Motion will each be denied, in full.

## I.    BACKGROUND

The following allegations are drawn from Plaintiff's Complaint (Doc. 1) and documents referenced therein,[2] or are otherwise subject to judicial notice, and are accepted as true for present purposes.

### A. Statutory and regulatory framework

#### i.   Title IX

Title IX prohibits discrimination on the basis of sex at all federally funded universities. 20 U.S.C. § 1681(a). Its purpose is two-fold: "to prevent federal funds from being used to support discriminatory practices," and "to provide individuals 'effective protection against those practices.'" *Lozano v. Baylor Univ.*, 408 F. Supp. 3d 861, 879 (W.D. Tex. 2019) (Pitman, J.) (quoting *Cannon v. Univ. Chic.*, 441 U.S. 677,

---

[2] The Court *accepts* LCG's *unopposed* invitation to consider the January 17, 2017 Campus Accountability and Safety Act Memorandum of Understanding between UL Lafayette and the Lafayette PD (Doc. 22-3). This document is referenced repeatedly throughout Plaintiff's Complaint, and is specifically cited as a source of LCG's duty of care. It is also set forth in contractual form, and therefore susceptible to plain reading, without converting LCG's Rule 12 motion to a motion for summary judgment.

By contrast, the Court *rejects* ULS's *opposed* invitation to consider Plaintiff's original December 14, 2018 Incident Report detailing Silva's assault, submitted to Louisiana Tech University Police. ULS offers no explanation regarding the significance of this document, and merely cites it to assert two additional facts not found in the Complaint: (1) Plaintiff initially encountered Silva on a dating app; and (2) Silva's attack occurred at his off-campus apartment. (Doc. 40-1 at pp. 1 n.1, 2). But these additional facts are not "central" to Plaintiff's claims, and ultimately do not sway the Court's analysis. Further, these facts are consistent with the facts alleged in the Complaint. Finally, as to be expected, the Incident Report consists of Plaintiff's allegations and impressions regarding Silva's assault, and therefore injects evidentiary issues inappropriate for consideration at the motion to dismiss stage.

704 (1979)). Universities that accept federal funding—by, for example, enrolling students who receive federal funds to pay for their education—are subject to the requirements of Title IX. *Id.* (citing *NCAA v. Smith*, 525 U.S. 459, 466 (1999)).

In 2001, the U.S. Department of Education ("DOE") issued its Revised Sexual Harassment Guidance ("2001 Guidance"), setting out Title IX's "compliance standards" for determining whether federally funded universities "recognize and effectively respond to sexual harassment of students."[3] The 2001 Guidance incorporates relevant federal caselaw, statutes, and implementing regulations, and remained in effect at all times relevant to this dispute.[4] Several provisions of the 2001 Guidance are relevant here (for reasons soon to become clear):

- "Sexual harassment of students can be a form of sex discrimination covered by Title IX." (2001 Guidance at p. 1).

- Title IX's protection extends to "all of the academic, educational, extra-curricular, athletic, and other programs of the school, whether they take place in the facilities of the school, on a school bus, at a class or training program sponsored by the school at another location, or elsewhere." (*Id.* at pp. 2-3).

- Upon receiving notice of sexual harassment, a school must take "immediate effective action to eliminate the hostile environment and prevent its recurrence." (*Id.* at pp. 12). "These steps are the school's responsibility whether or not the student who was harassed makes a complaint or otherwise asks the school to take action." (*Id.* at p. 15)

- Notice of sexual harassment may come from "indirect ... sources such as a member of the school staff, a member of the educational or local community, or the media." (*Id.* at p. 13). If a school learns of harassment through such means, the school must consider "the source and nature of the information; the seriousness of the alleged incident; the specificity

---

[3] The Court takes judicial notice of the 2001 Guidance, and the implementing regulations referenced therein. Fed. R. Evid. 201(b)(2). The 2001 Guidance is available at: https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html (last visited Dec. 23, 2022).

[4] The 2001 Guidance was rescinded on August 26, 2020.

of the information; the objectivity and credibility of the source of the report; whether any individuals can be identified who were subjected to the alleged harassment; and whether those individuals want to pursue the matter" to determine the appropriate response. (*Id.* at p. 18)

- Schools must provide grievance procedures providing for prompt and equitable resolution of complaints of sexual harassment. (*Id.* at p. 14)

- A grievance procedure cannot be prompt or equitable unless students know that it exists, how it works, and how to file a complaint. Thus, the procedures should be accessible, easily understood, and widely disseminated. (*Id.* at p. 20)

- Concurrent police investigations into potential criminal conduct involving sexual assault "may not be determinative of whether harassment occurred under Title IX and do not relieve the school of its duty to respond promptly and effectively." (*Id.* at p. 21).

- **"If harassment has occurred, doing nothing is always the wrong response."** (*Id.* at Preamble p. iii (emphasis added)).

### ii. Act 172

On October 20, 2014, the Louisiana Governor's Office issued Executive Order No. BJ 2014-14 ("EO 2014-14"), entitled "Uniformity of Policies Related to the Crime of Sexual Assault."[5] EO 2014-14 expressly acknowledged that "sexual assault is a horrendous crime that creates physical and emotional damage to victims," and that Louisiana's public universities had implemented piecemeal measures for reporting and preventing sexual assault, resulting in an "outdated" and "fractured approach to this critical issue." EO 2014-14 mandated that the "Louisiana Board of Regents coordinate uniform policies and best practices among the public postsecondary education institutions to implement measures to address the reporting of sexual

---

[5] The Court takes judicial notice of EO 2014-14. *See* Fed. R. Evid. 201(b)(2). EO 2014-14 is available at:
http://regents.state.la.us/assets/docs/PRAA/LA_SAFE_Docs/BJ201414UniformityofPoliciesR elatedtotheCrimeofSexualAssault(3).pdf (last visited Dec. 23, 2022).

assault on their campuses, the prevention of such crimes, and the medical and mental health care needed for these victims."

Eight months later, on June 23, 2015, the Governor signed into law Act 172, the "Campus Accountability and Safety Act." La. R.S. § 17:3399.11 (2015), *et seq.*[6] Act 172 codified EO 2014-14's mandate that public universities establish "uniform policies" to address and prevent sexual assault, defined sexual assault to include "any sexual assault offense … and any sexual abuse offense" under Louisiana law, acknowledged universities' duty to comply with Title IX, and required universities to develop and implement "training" consistent with the requirements of Act 172 and Title IX for "each individual who is responsible for resolving complaints of reported sex offenses or sexual misconduct policy violations."

Additionally, Act 172 set forth coordination and reporting requirements among public universities and local law enforcement agencies. Specifically, Act 172 states:

> F. Inter-campus transfer policy:
>
> (1) The Board of Regents' Uniform Policy on Sexual Assault shall require that institutions communicate with each other regarding transfer of students against whom disciplinary action has been taken as a result of a code of conduct violation relating to sexually-oriented criminal offenses.
>
> (2) The Board of Regents' Uniform Policy on Sexual Assault shall require that institutions withhold transcripts of students seeking a transfer with pending disciplinary action relative to sexually-oriented criminal offenses, until such investigation and adjudication is complete.

La. R.S. § 3399.15 (2015) (Campus Security Policy). Additionally, Act 172 states:

---

[6] The Court takes judicial notice of Act 172. *See* Fed. R. Evid. 201(b)(2). Act 172 is available at: https://regents.state.la.us/assets/docs/PRAA/LA_SAFE_Docs/Act172.pdf (last visited Dec. 23, 2022).

A. Each institution and law enforcement and criminal justice agency located within the parish of the campus of the institution shall enter into a memorandum of understanding to clearly delineate responsibilities and share information in accordance with applicable federal and state confidentiality laws, including but not limited to trends about sexually-oriented criminal offenses occurring against students of the institution.

...

C. Each memorandum of understanding entered into pursuant to this Part shall include:

(1) Delineation and sharing protocols of investigative responsibilities.

(2) Protocols for investigations, including standards for notification and communication and measures to promote evidence preservation.

(3) Agreed-upon training and requirements for the parties to the memorandum of understanding on issues related to sexually-oriented criminal offenses for the purpose of sharing information and coordinating training to the extent possible.

(4) A method of sharing general information about sexually-oriented criminal offenses occurring within the jurisdiction of the parties to the memorandum of understanding in order to improve campus safety.

D. The local law enforcement agency shall include information on its police report regarding the status of the alleged victim as a student at an institution as defined in this Part.

La. R.S. § 3399.14 (2015) (Coordination with local law enforcement)

### iii. The Uniform Policy

On August 26, 2015, the Board of Regents amended its Uniform Policy on Sexual Misconduct ("Uniform Policy") to comply with Act 172.[7] The Uniform Policy instructed all public universities and their management boards—including ULS—to

---

[7] The Court takes judicial notice of the Uniform Policy. *See* Fed. R. Evid. 201(b)(2). The Uniform Policy is available at: https://regents.state.la.us/assets/docs/PRAA/BORSexualMisconductPolicyAct172FINALAugust24.pdf (last visited Dec. 23, 2022).

"begin establishing policies and procedures in full compliance with this Amended Policy immediately and [to] implement those policies no later than October 30, 2015."

In relevant part, the Uniform Policy states,

> If a student accused of a sexually-oriented criminal offense seeks to transfer to another institution during an investigation, the institution shall withhold the student's transcript until such investigation or adjudication is complete and a final decision has been made. Each institution shall inform the respondent of the institution's obligation to withhold the transcript during the investigation.

Management boards—including ULS—were also required to ensure that universities under their supervision complied with the requirements of Title IX and Act 172.

### iv. The Lafayette MOU

Consistent with the requirements of EO 2014-14, Act 172, and the Uniform Policy, on January 17, 2017 the Lafayette PD executed a Campus Accountability and Safety Act Memorandum of Understanding with UL Lafayette (the "Lafayette MOU"). The Lafayette MOU states that it is entered "for the purpose of delineating responsibilities and sharing information specific to [sexually-oriented criminal offenses] involving University of Louisiana at Lafayette as required by [Act 172]," (Doc. 22-3 at p. 1), and provides, in relevant part, that LPD "agrees to:

- Notify UL Lafayette's Title IX Coordinator, to the extent we are able with respect to any confidentiality requirements, of any report of a sexually oriented criminal offense that may have occurred on its campus or involved a student as a victim or an accused; ...

- Share general information about sexually-oriented criminal offenses that may have occurred on its campus or involved a student as a victim or an accused to improve campus safety[.]

(*Id.* at p. 4).

8

### B. Plaintiff is raped by a "Daniel" Silva at Louisiana Tech

Plaintiff was a junior at Louisiana Tech when she met fellow Tech student "Daniel." (Doc. 1 at ¶¶ 76-77). The first time Plaintiff encountered "Daniel" in person he was helping a mutual acquaintance with her homework. (*Id.* at ¶ 79). Thereafter, Plaintiff agreed to meet and study with "Daniel" on three separate occasions. The first and second of these study sessions occurred in public settings on Louisiana Tech's campus and were uneventful. (*Id.* at ¶¶ 80-81).

Things changed, however, on September 18, 2018, when Plaintiff accepted "Daniel's" invitation to study with him at his apartment. (*Id.* at ¶ 82). That evening, after they completed their studies, Plaintiff and "Daniel" joined "Daniel's" roommate and various others for a party in the living room. (*Id.* at ¶ 83). Over the next hour Plaintiff drank multiple shots of whiskey and became highly intoxicated. (*Id.* at ¶ 84). Plaintiff informed "Daniel" that she was "incredibly drunk," to which he responded by encouraging her to drink more and to spend the night rather than risk driving home. (*Id.* at ¶ 86). "Daniel" assured Plaintiff that if she stayed over, they would sleep in separate rooms. (*Id.* at ¶¶ 88-89).

Realizing that she was too drunk to drive, Plaintiff eventually relented and agreed to stay the night. (*Id.* at ¶ 87). At approximately 1:00 a.m., while "Daniel" and the others were still socializing in the living room, Plaintiff retired to "Daniel's" bedroom and, fully clothed, fell asleep on his bed, intending to sleep off the alcohol. (*Id.* at ¶ 89). Thereafter, throughout the night, "Daniel" repeatedly raped and sexually assaulted Plaintiff, as she was in and out of consciousness. (*Id.* at ¶¶ 90-98).

The next morning, Plaintiff reported "Daniel's" assault to a close friend and to

Kaiti Lammert, Assistant Director of the Wesley Foundation, a Christian ministry at Louisiana Tech. (*Id.* at ¶ 100). In the following days, Plaintiff told a few additional people she trusted about the assault, including Ryan Ford, Director of the Wesley Foundation. (*Id.* at ¶ 103). Plaintiff did not initially report "Daniel's" assault to Louisiana Tech administration or to law enforcement, however, because she did not know "Daniel's" last name, and because she "was afraid." (*Id.* at ¶ 104).

During this time, Plaintiff frequently encountered "Daniel" on campus, which frightened and re-traumatized her, prompting her to alter routines and avoid areas of campus where she might interact with him. (*Id.* at ¶ 105). Plaintiff "struggled greatly," suffered "impaired educational capacity," and endured severe physical, emotional, and mental injury and pain. (*Id.* at ¶¶ 11, 133, 149, 155, 161, 170).

### C. Plaintiff learns Silva's identity and reports him to Louisiana Tech and to law enforcement

Approximately 12 weeks later, on December 11, 2018, Plaintiff was visiting Director Ford at the Wesley Foundation when she viewed a sorority group chat warning that a Tech student named Victor Daniel Silva had sexually assaulted other women. (*Id.* at ¶ 106). The chat included a picture of Silva, who Plaintiff recognized as "Daniel." (*Id.* at ¶ 107). Armed with a full name, and determined to hold Silva accountable, Plaintiff decided to report Daniel to Tech and to law enforcement.

On December 14, 2018, Plaintiff reported Silva's assault to Louisiana Tech's Title IX Coordinator, Carrie Flournoy. (*Id.* at ¶ 109). At this meeting, Ms. Flournoy told Plaintiff that Tech "had been receiving calls and reports about Silva" and was "waiting for someone to come forward with an accusation against him," and that "the

Chief of the University Police was looking into Silva's past." (*Id.* at ¶ 111). Then, Ms. Flournoy accompanied Plaintiff to the University President's office, where Plaintiff reported Silva's assault to Tech University Police Lieutenant Patrick Simmons. (*Id.* at ¶ 114). Thereafter, Plaintiff reported Silva's assault again to the Ruston Police Department. (*Id.* at ¶ 115).

Three days later, on December 17, 2018, Plaintiff attended a follow-up meeting with Tech administration regarding her report. (*Id.* at ¶ 116). At this meeting, Tech administrators informed Plaintiff that, after she filed her report, Silva withdrew from school, and, as a result, Tech would not investigate Silva or otherwise pursue Plaintiff's report. (*Id.* at ¶ 117). Still, the administrators assured Plaintiff that Tech's investigation would continue if Silva re-enrolled. (*Id.*). Notably, Tech did not inform Plaintiff of her right to file a Title IX complaint against Silva (at Tech or any other school), did not provide Plaintiff Title IX paperwork, did not provide Plaintiff a "report" of any investigation, and never even requested that Plaintiff "prepare a written statement regarding Silva's sexual assault." (*Id.* at ¶ 124).

### D. Defendants knew that Silva was reported for sexual assault multiple times, failed to share information, and allowed Silva to remain enrolled in Louisiana's state university system

More than two years passed without any follow-up. (*Id.* at ¶ 123). Then, on May 26, 2021, USA Today published an expansive article revealing publicly that between the years 2014 and 2018—*before* assaulting Plaintiff—*five* additional women reported Silva for rape and assault. (*Id.* at ¶ 3). The first of these occurred in the Fall of 2014, when Silva—then a freshman at LSU—was reported for rape at LSU's Baton Rouge campus. (*Id.* at ¶ 38). Just weeks after receiving the report, LSU permitted

Silva to transfer to UL Lafayette. (*Id.* at ¶¶ 41-42).

The second report occurred in April 2015, and also involved an alleged rape at LSU's Baton Rouge campus. (*Id.* at ¶¶ 44-47). Silva—then a student at UL Lafayette—returned to Baton Rouge for a visit, met a LSU student at a bar, and thereafter raped her multiple times in her dorm room. (*Id.* at ¶ 47). Silva was arrested and charged with second degree rape, prompting LSU to label Silva a "frequent flier" and to ban him from campus. (*Id.* at ¶¶ 48-51).

LSU never formally notified UL Lafayette of Silva's Fall 2014 report, his April 2015 arrest, *or* his ban from campus. (*Id.* at ¶ 55-56). Still, UL Lafayette learned of Silva's April 2015 arrest (but not the 2014 report or the campus ban) informally when Carl Tapo, UL Lafayette's Dean of Students, received an email from a LSU administrator attaching a news article detailing the allegations against Silva. (*Id.* at ¶ 54). Despite receiving actual notice of Silva's rape arrest, Dean Tapo did not initiate an investigation, and instead placed Silva on disciplinary probation for two years. As part of his probation, Silva was required to attend behavior management classes. (*Id.* at ¶¶ 54-62, 136). During his probationary period, UL Lafayette employed Silva to tutor local high school students. (*Id.* at ¶ 63).

The third, fourth, and fifth reports occurred between November 2016 and June 2018—when Silva was a student (on probation) at UL Lafayette. Two UL Lafayette students and one local community college student reported Silva to the Lafayette PD for sexual misconduct including assault, voyeurism, and blackmail. (*Id.* at ¶¶ 68-70). Yet, LPD did not inform UL Lafayette of these reports, despite LPD's information

sharing obligations under Act 172 and the Lafayette MOU. (*Id.* at ¶¶ 72-74).

In Fall 2018, weeks after LPD received the third report against Silva (alleging sexual assault of a minor), UL Lafayette allowed Silva to transfer to Tech with a clean academic record. (*Id.* at ¶ 75). Silva's transfer papers failed even to mention that Silva was previously on disciplinary probation due to his rape arrest. (*Id.*).

One month after he arrived at Louisiana Tech, Silva targeted and attacked Plaintiff. (*Id.* at ¶¶ 76-98).

Plaintiff read the USA Today article the day it was published, and learned of the institutional neglect that allowed Silva to continue his sexual predation against female college students, largely without consequence. (*Id.* at ¶¶ 127-28). Specifically, Plaintiff learned for the first time that:

- LSU knew of two reported rapes of female college students perpetrated by Silva, and had banned Silva from campus, yet failed to inform UL Lafayette or Louisiana Tech of the same.

- UL Lafayette knew that Silva was arrested for rape in April 2015 and had placed him on disciplinary probation.

- While a student at UL Lafayette, three additional women reported to the Lafayette PD that Silva committed sex crimes against them.

- LPD had entered into the Lafayette MOU, requiring LPD to notify UL Lafayette's Title IX Coordinator of any reported sexually-oriented criminal offenses involving a student as a victim or an accused.

- LPD violated the MOU when it failed to share with UL Lafayette the fourth and fifth sexual assault reports against Silva.[8]

- UL Lafayette allowed Silva to transfer to Louisiana Tech with a clean record despite Silva having previously been placed on disciplinary probation due to his rape arrest.

---

[8] LPD executed the Lafayette MOU on January 17, 2017, *after* the third report against Silva.

- Days after Plaintiff reported Silva's rape to Louisiana Tech, Tech permitted Silva to transfer back to UL Lafayette without withholding his transcript, as required by Act 172 and the Uniform Policy.

- Despite his transfer back to UL Lafayette, ULS did not investigate or discipline Silva in connection with Plaintiff's reported rape.

(*Id.* at ¶¶ 128-129).

In sum, on May 26, 2021, Plaintiff learned for the first time of the institutional failures—and accompanying violations of federal and state laws intended to remove sexual predators from college campuses—that pre- *and* post-dated Silva's September 18, 2018 attack. (*Id.* at ¶ 129). Plaintiff alleges that even had she tried, she could not have discovered the nonfeasance revealed in the USA Today article, which was uncovered by "an accomplished and highly experienced investigative journalist, through multiple sources, including [Silva's five prior victims]; interviews; official statements; requests; and other information, particularly given FERPA's[9] general prohibition on disclosing the personally identifying information of students." (*Id.* at ¶ 132).

## II.  PROCEDURAL HISTORY

On May 25, 2022, Plaintiff initiated this action, seeking damages from LSU, ULS (the supervising authority responsible for both UL Lafayette and Louisiana Tech), and LCG (the supervising authority responsible for the Lafayette PD). Writ large, Plaintiff alleges that her rape was the direct and predictable consequence of

---

[9] FERPA, or the Family Educational Rights and Privacy Act, prohibits the release of educational records containing "personally identifiable information" absent written consent from the student or their parents, a judicial order directing such disclosure, or a lawfully issued subpoena. 20 U.S.C. § 1232g(b)(2); 34 C.F.R. § 99.3.

Defendants' repeated failures to perform their duties to report, investigate, and discipline Silva for his prior sexual offenses, failures that continued even *after* she reported her rape. Specifically, against ULS, Plaintiff alleges pre- and post-assault deliberate indifference in violation of Title IX, and state law negligence. (Doc. 1 at ¶¶ 134-155). Against LSU and LCG, Plaintiff alleges state law negligence only. (*Id.* at ¶¶156-170).

Now Defendants each move to dismiss Plaintiff's claims. For their part, ULS and City of Lafayette argue primarily that Plaintiff's action is time-barred because she failed to pursue her claims within one year of December 2018, when she first reported Silva's assault. (Doc. 22-1 at pp. 7-14; Doc. 40-1 at pp. 5-17). Additionally, these Defendants argue that Plaintiff's allegations fail to state any actionable claim, and that, in any event, they are each entitled to the benefit of various state law immunities. (Doc. 22-1 at pp. 14-21; Doc. 40-1 at pp. 17-28). LSU, by contrast, asserts only one defense: that regardless of the merits of Plaintiff's negligence claim, Plaintiff cannot pursue it in federal court (and must instead proceed to state court) because LSU is shielded by sovereign immunity under the Eleventh Amendment. (Doc. 23). Plaintiff opposes Defendants' Motions. (Doc. 24, Doc. 31, Doc. 41).

## III.    LAW AND ANALYSIS

### A. Standard

Defendants invoke three different mechanisms for dismissal of Plaintiff's action under Federal Rule of Civil Procedure ("Rule") 12: Rule 12(b)(1) (LSU); Rule 12(b)(6) (LCG); *and* Rule 12(c) (ULS). Still, the analysis is functionally the same. The critical issue is whether the complaint contains "sufficient factual matter, accepted

as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Home Builders Ass'n of Mississippi, Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) ("A motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief."); *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) ("A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6).").

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft*, 556 U.S. at 679. Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Hence, the complaint need not set out "detailed factual allegations," but something "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action" is required. *Twombly*, 550 U.S. at 555. When conducting its inquiry, the Court accepts all well-pleaded facts as true and views those facts in the light most favorable to the plaintiff. *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010).

### B. Discussion

#### i. LSU

"The Eleventh Amendment bars suits against a state [in federal court] by a citizen of that state or a different state," *Hirtz v. State of Tex.*, 974 F.2d 663, 666 (5th Cir. 1992), "unless the state has waived its sovereign immunity or Congress has

expressly abrogated it." *Raj v. Louisiana State Univ.*, 714 F.3d 322, 328 (5th Cir. 2013) (citations omitted). "[E]leventh amendment immunity is a jurisdictional issue that cannot be ignored." *McDonald v. Bd. of Mississippi Levee Comm'rs*, 832 F.2d 901, 906 (5th Cir. 1987) (quotation marks omitted). Still, "sovereign immunity is a personal privilege which [the state] may waive at pleasure." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999).

LSU "is an arm of the state" for Eleventh Amendment purposes, and state law negligence claims fall squarely within the ambit of the Eleventh Amendment's protection. *See Raj*, 714 F.3d at 328. Thus, absent a waiver from LSU, Plaintiff cannot pursue her negligence claim here. *See id.* LSU has now expressly declined to waive its immunity, even for the limited purposes of this litigation. (Doc. 49 at p. 1). And while the Court questions the motivation for LSU's tack—which suggests that LSU prefers parallel state court proceedings and the attendant judicial inefficiencies (duplicative discovery, increased litigation costs, additional burdens on the judiciary, and even the possibility of contradictory outcomes)—the Court "cannot ignore" LSU's "privilege." *See Coll. Sav. Bank*, 527 U.S. at 675; *McDonald*, 832 F.2d at 906. As such, LSU's Motion will be granted, and Plaintiff's negligence claim against LSU will be dismissed without prejudice, to be pursued in state court.

### ii.  ULS

ULS challenges the merits and the timeliness of Plaintiff's claims. ULS also asserts that it is "entitled to statutory immunity … for any purported negligence." The Court addresses ULS's attacks on Plaintiff's Title IX claims first.

### a. Title IX

Title IX's prohibition against sex discrimination at federally funded universities is enforceable through an individual's private right of action. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 639 (1999). "The recognition of this private right of action has given rise to two general avenues for Title IX claims—one for claims based on an official policy of discrimination and another for claims based on an institution's actual notice of and deliberate indifference to sexual harassment or assault." *Lozano*, 408 F. Supp. 3d at 879.

Plaintiff asserts two varieties of the *second* type of Title IX claim. Plaintiff's "heightened-risk claim" alleges that prior to her assault, ULS's deliberate indifference to actual notice of the threat posed by Silva—manifested by ULS's failures to investigate or meaningfully discipline Silva after he was arrested for rape *and* to prevent Silva from transferring to Tech—substantially increased her risk of being sexually assaulted by Silva. (Doc. 1 at ¶¶ 134-143).

Plaintiff's "post-reporting claim" alleges that ULS's deliberately indifferent response to her own report of Silva's September 2018 assault—manifested by ULS's failures to investigate or discipline Silva even *after* he returned to UL Lafayette—deprived her of educational opportunities provided by Tech. (*Id.* at ¶¶ 144-149).

### 1. Plaintiff's Title IX claims are adequately alleged

Despite their differences, the same elements define Plaintiff's heightened-risk claim and her post-reporting claim. *See Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 341–42 (5th Cir. 2022). As to each, Plaintiff must allege (and ultimately prove): (1) ULS had actual knowledge of the harassment; (2) the harasser (Silva) was

18

under ULS's control; (3) the harassment was based on the victim's (Plaintiff's) sex;
(4) the harassment was "so severe, pervasive, and objectively offensive that it
effectively barred the victim's access to an educational opportunity or benefit"; and
(5) ULS was deliberately indifferent to the harassment. *Id.* at 341.

### a) Plaintiff's post-reporting claim

ULS challenges the second, fourth, and fifth elements of Plaintiff's post-
reporting claim, arguing that Plaintiff has failed to allege facts establishing ULS's
control over Silva, the severity of Silva's assault, and ULS's deliberate indifference.

### 1. Control element

The control element is two-pronged: Plaintiff must show that ULS "'exercises
substantial control over both the harasser and the context' in which the harassment
occurs." *Hernandez v. Baylor Univ.*, 274 F. Supp. 3d 602, 612 (W.D. Tex. 2017)
(Pitman, J.) (quoting *Davis,* 526 U.S. at 645). ULS insists that Plaintiff's allegations
fall short because Silva raped Plaintiff at his off-campus apartment, and ULS "has
[no] control over students or acts that occur off-campus." (Doc. 40-1 at p. 24).

The Court is not persuaded. ULS cites only one case holding that student-on-
student assault occurring *off*-campus is not actionable under Title IX, specifically,
*Brown v. State*, 23 F.4th 1173, 1180 (9th Cir. 2022). Even that case, however, did *not*
go so far as to hold that the university lacked control over the student-attacker simply
because he attacked his victim off-campus. To the contrary, the Ninth Circuit
*affirmed* the district court's ruling that the university "exercised substantial control
over [the attacker] because he was a student athlete." *Id.* at 1180. Still, the Circuit
held that the university was not liable because it lacked substantial control over the

context in which the assault occurred—"a private, off-campus residence unconnected to any school activity." *Id.*

Whatever may be said of the Ninth Circuit's *Brown* decision, it has since been vacated and re-set for *en banc* decision. *See Brown v. Arizona*, No. 20-15568, 2022 WL 17546341, at *1 (9th Cir. Dec. 9, 2022). As a result, ULS lacks *any* authority for the broad proposition that Title IX does not apply when student rape occurs off-campus.

By contrast, multiple courts have found that off-campus rape and assault *is* actionable, particularly when the university is actually aware of prior assaults by the *same* student-attacker. *E.g. Hernandez*, 274 F. Supp. 3d at 610-612 (student-plaintiff stated actionable heightened risk *and* post-reporting claims based on sexual assault that occurred at "an off-campus party," where the university knew of prior reports of sexual assault committed by the same student-attacker); *accord Farmer v. Kansas State Univ.*, 918 F.3d 1094, 1097 (10th Cir. 2019) (actionable Title IX claims based on rapes occurring at off-campus fraternity houses and vehicles); *Lozano*, 408 F. Supp. 3d at 883 (actionable Title IX claims based on assaults occurring at off-campus apartment and a restaurant parking lot); *Doe 1*, 240 F. Supp. 3d at 654 (actionable Title IX claims based on sexual assault occurring "at a house near campus"). The Court finds these authorities more persuasive than the now-defunct *Brown* decision, and plainly more consistent with the DOE's policy statement that Title IX's protection extends to "all of the academic, educational, extra-curricular, athletic, and other programs of the school, whether they take place in the facilities of the school, on a school bus, at a class or training program sponsored by the school at another location,

or elsewhere." (2001 Guidance at pp. 2-3).

Here, Plaintiff plainly alleges sufficient facts to establish that ULS exercised substantial control over Silva (the attacker). Again, even *Brown* dictates this conclusion. *Brown*, 23 F.4th at 1180. Silva was, at different times, enrolled at Tech and UL Lafayette. As a university student, Silva was subject to these schools' codes of conduct, rules, and policies, illustrated by the fact that Dean Tapo placed Silva on disciplinary probation after discovering Silva's rape arrest.

The same goes for Plaintiff's allegations regarding ULS's control over the "context" of her attack. Plaintiff alleges that despite knowing of Silva's rape arrest, ULS allowed Silva to transfer to Tech with a clean academic record. (*Id.* at ¶ 128). The first two times Plaintiff met Silva, she met him for study sessions "in the library and Tolliver Hall, both on Tech's campus." (*Id.* at ¶ 80). Common sense dictates that Silva would not have been permitted to access to these locations but for the fact that he was a Tech student, which, Plaintiff alleges, "lent [Silva] a sense of credibility and trustworthiness." (*Id.* at ¶ 79). During these on-campus study sessions, Plaintiff also met Silva's roommate, and observed Silva and another female Tech student helping each other with their homework. (*Id.* at ¶¶ 79, 81). Based on these interactions—which allegedly should not and would not have occurred had ULS properly investigated Silva's arrest and disciplined him appropriately—Plaintiff accepted Silva's invitation to study and socialize at his apartment, located "in an apartment complex known to house Tech students." (Doc. 1 at ¶ 79).

At this stage, Plaintiff's allegations establish a plausible basis to conclude that

ULS also exercised substantial control over "the context" where she was raped, even *if* the rape occurred off-campus. These allegations will benefit from evidentiary development to determine the full extent of the connection between ULS and the activities, persons, and events at Silva's apartment complex.

## 2. Severity element

Next, incredibly, ULS challenges whether Plaintiff has adequately alleged that she was injured by Silva's rape, complaining that Plaintiff "only generally pleads an 'impaired educational capacity'" and does not specifically allege "that she transferred schools, failed to graduate, or received lower grades than in the past." (Doc. 40-1 at p. 24). This argument is equal parts obtuse and unfounded.

Unquestionably, rape is severe and objectively offensive sexual harassment sufficient to support an actionable Title IX claim, *even in the absence* of allegations that a plaintiff's academic track was thrown off course. *Kelly v. Yale Univ.*, No. 01-cv-1591, 2003 WL 1563424, at *3 (D. Conn. Mar. 26, 2003) (Hall, J.) ("There is no question that a rape ... constitutes severe and objectively offensive sexual harassment under the standard set forth in *Davis*."); *accord Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999) (rape "obviously qualifies as severe, pervasive, and objectively offensive sexual harassment that could deprive [the victim] of access to the educational opportunities provided by her school"); *Doe through Doe v. Brighton Sch. Dist. 27J*, No. 19-cv-0950, --- F.Supp.3d ----, 2020 WL 886193, at *6 (D. Colo. Feb. 24, 2020) (Martinez, J.) ("[A] single, serious sexual assault can meet the severe, pervasive, and offensive standard." (citing authorities));

Moreover, and in any event, Plaintiff specifically alleges that after Silva's

attack, she changed her routines and avoided certain areas of campus to minimize chance encounters, thus depriving her of the full scope of opportunities provided by Tech. *See Kelly*, 2003 WL 1563424, at *3 ("[A] reasonable jury could conclude that further encounters, of any sort, between a rape victim and her attacker could create an environment sufficiently hostile to deprive the victim of access to educational opportunities provided by a university.").

### 3. Deliberate indifference element

Finally, ULS challenges the deliberate indifference element, arguing that its failure to comply with the requirements of Act 172, standing alone, "cannot serve as the basis for establishing deliberate indifference." (Doc. 40-1 at p. 23). Again, ULS misses the mark. Plaintiff's claim is not founded on ULS's abstract failure to comply generally with the requirements of Title IX, Act 172, and the Uniform Policy.[10] Rather, Plaintiff specifically alleges that *after* informing Tech's Title IX coordinator of Silva's rape, ULS failed even to investigate her report.

Title IX's "deliberate indifference" element is "a high bar." *Roe*, 53 F.4th at 341. Still, it is satisfied where the school's "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. Here, Plaintiff alleges that ULS obtained actual knowledge of student-on-student rape—sexual harassment that is obviously so severe, pervasive and objectively offensive as to deprive Plaintiff access to Tech's educational benefits and resources.

---

[10] Of course, even if a school's general non-compliance with statutory, regulatory, and administrative guidance cannot, of itself, establish deliberate indifference, relevant law, regulation, and policy "may still be consulted when assessing the appropriateness of a school's response to reports of sexual assault." *Hernandez*, 274 F. Supp. 3d at 614 (citing authorities).

*Kelly*, 2003 WL 1563424, at *3. Confronted with a report of rape, law and policy converge: the school *cannot* "turn a blind eye to that harassment." *Farmer*, 918 F.3d at 1104. "[D]oing nothing is always the wrong response," (2001 Guidance at Preamble p. iii), yet "nothing" is exactly what Plaintiff contends that ULS did here. As alleged, ULS's response to Plaintiff's report was clearly unreasonable under the circumstances, thus satisfying the deliberate indifference standard. *See Davis*, 526 U.S. at 641 (indicating that a school cannot "remain idle in the face of known student-on-student harassment"); *e.g. Farmer*, 918 F.3d at 1104 (deliberate indifference established where plaintiffs reported off-campus rapes and university failed to investigate or discipline the attackers); *Williams*, 477 F.3d at 1296 (deliberate indifference established where plaintiff reported rape and university waited eight months "before conducting a disciplinary hearing to determine whether to sanction the alleged assailants"); *Doe 1*, 240 F. Supp. 3d at 660–61 (deliberate indifference established where plaintiffs reported rapes and sexual assaults and the university "did nothing (or almost nothing) in response").

### b) Plaintiff's heightened risk claim

ULS challenges the first (actual knowledge) and second (control) elements of Plaintiff's heightened risk claim, arguing that Plaintiff "has not plead [sic] ... that [ULS] had knowledge of the alleged prior acts of sexual misconduct by Silva," or that "it would have had the ability to prevent Plaintiff from studying at Silva's apartment, 'partying' at Silva's apartment and then spending the night at Silva's apartment." (Doc. 40-1 at pp. 26-27). Additionally, ULS asserts that Plaintiff's claim fails because she "cannot show that UL System's policy or custom of handling reports of sexual

24

assault caused Plaintiff's sexual assault." (*Id.* at p. 27).

ULS's arguments are easily dispatched. As an initial matter, Plaintiff is not required to show an official policy of sex discrimination when, as here, she alleges ULS's actual notice of, and deliberate indifference to, Silva's prior sexual misconduct. *See Lozano*, 408 F. Supp. 3d at 879; *Doe 1*, 240 F. Supp. 3d at 657.

Second, ULS's argument that Plaintiff fails to allege ULS's "knowledge of the alleged prior acts of sexual misconduct by Silva" is flatly contradicted by Plaintiff's Complaint, which specifically asserts that in April 2015 Dean Tapo—an "appropriate person" under Title IX, with authority to investigate and respond to allegations of sexual assault—*knew* of Silva's prior rape arrest, yet failed to conduct any investigation whatsoever, and instead responded by placing Silva on disciplinary probation. (Doc. 1 at ¶¶ 54, 59-60, 62, 136). These allegations establish ULS's actual knowledge of unlawful harassment *and*—based on ULS's alleged inaction—deliberate indifference to the same (for reasons already explained). *E.g.*, *Hernandez*, 274 F. Supp. 3d 614-615 (student-plaintiff pleaded actionable heightened risk claim based on school's actual knowledge of prior reports of sexual assault committed by the student-attacker, and failure to investigate the same).

Finally, the Court has already rejected ULS's argument that it lacked substantial control over Silva merely because Silva raped Plaintiff at his apartment.

## 2. Plaintiff's Title IX claims are timely

Next, ULS argues that regardless of their merit, Plaintiff's Title IX claims "prescribed, at the latest, in December 2019," one year after Plaintiff learned Silva's identity and reported him to Louisiana Tech. (Doc. 40-1 at p. 17). And because

Plaintiff did not sue until May 2022, her Title IX claims are time-barred. (*Id.*).

### a) Title IX limitations standard

Title IX does not set forth a limitations period. "When a federal statute does not contain a limitations period … the settled practice is to borrow an 'appropriate' statute of limitations from state law." *King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 758 (5th Cir. 2015). The Fifth Circuit instructs that a Title IX action is subject to Louisiana's one-year prescriptive period for personal injury actions, La. C.C. art. 3492. *See id.*

"Absent tolling, the limitations period runs from the moment a plaintiff's claim 'accrues,' and while we borrow the limitations period from state law, the particular accrual date of a federal cause of action is a matter of federal law." *King-White*, 803 F.3d at 762 (quotation marks omitted). "Under federal law, a claim accrues and the limitations period begins to run the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured." *Id.* (quotation marks omitted). "A plaintiff's awareness encompasses two elements: (1) the existence of the injury; and (2) causation, that is, the connection between the injury and the defendant's actions." *Id.* (quotation marks and alterations omitted).

Even when a Title IX claim has accrued and would otherwise be time-barred, "[e]quitable doctrines may toll the statute of limitations. When a federal cause of action borrows a state statute of limitations, coordinate tolling rules apply." *Lozano*, 408 F. Supp. 3d at 899. Relevant here, Louisiana's doctrine of *contra non valentem* tolls a limitations period "where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action." *Lomont v. Bennett*,

2014-2483 (La. 6/30/15), 172 So. 3d 620, 637.

As a rule, a limitations defense is not favored at the pleadings stage because the dispositive issue of when the plaintiff became aware of her claim involves questions of fact that generally cannot be resolved without evidentiary development. *See Keenan v. Donaldson, Lufkin & Jenrette, Inc.*, 575 F.3d 483, 486 (5th Cir. 2009). Indeed, the Fifth Circuit instructs that "[Rule 12] dismissal under a statute of limitation is proper only when the complaint makes plain that the claim is time-barred and raises no basis for tolling." *Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*, 9 F.4th 247, 253 (5th Cir. 2021). Stated differently, a defendant may prevail on a limitations defense at Rule 12 *only* if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Abdul-Alim Amin v. Universal Life Ins. Co. of Memphis, Tenn.*, 706 F.2d 638, 640 (5th Cir. 1983) (quotation marks omitted)); *accord Petrobras*, 9 F.4th at 255-56 (at Rule 12 the defendant must "conclusively establish that the statute of limitations" expired prior to plaintiff filing suit (citing authorities)).

### b) Plaintiff's heightened risk claim

The parties have not directed the Court to any Fifth Circuit decision addressing the accrual date for a heightened risk claim of the type alleged here: that is, where the plaintiff contends that her own assault was the direct result of the university's deliberate indifference to prior reports of predatory sexual conduct by the same attacker. Recently, however, the U.S. Court of Appeals for the Sixth Circuit addressed this issue head-on, holding in *Snyder-Hill v. The Ohio State University* that "the claim does not accrue until the plaintiff knows or has reason to know that

the *defendant institution* injured them." 48 F.4th 686, 704 (6th Cir. 2022).

As in this case, *Snyder-Hill* involved allegations of predatory sexual conduct by a single perpetrator—Dr. Richard Strauss, a team physician employed by the Ohio State University from 1978 to 1998. As in this case, the plaintiffs asserted heightened risk claims, contending that Ohio State knew of Strauss's sexual misconduct yet did nothing, predictably resulting in their own assaults. *See id.* at 690-97. As in this case, multiple plaintiffs *knew* that they were assaulted at the time of Strauss's abuse,[11] yet did not pursue their claims against the university until years later because they were unaware of Ohio State's responsibility for Strauss's misconduct, and only learned of the university's misfeasance in 2018 when the university announced that it had engaged the Perkins Coie law firm to investigate the matter. *Id.* at 691-94.

Like ULS, Ohio State asserted that the plaintiffs' Title IX claims were barred by Ohio's (two-year) statute of limitations for personal injury actions, arguing that Strauss's abuse necessarily occurred prior to Strauss's retirement from the university (in 1998), plaintiffs knew or had reason to know that they were injured at the time they were abused, yet plaintiffs delayed pursuing their claims for 20 years (at minimum), suing Ohio State only *after* the university publicly announced the Perkins

---

[11] To clarify, some *Snyder-Hill* plaintiffs alleged that they did *not* immediately appreciate that Strauss's conduct was assault—and only learned of their victimization much later— because Strauss's sexual abuse occurred during regular physical examinations, the plaintiffs were teenagers at the time, and Strauss often provided "pretextual and false medical explanations for the abuse." *Snyder-Hill*, 48 F.4th at 693. By contrast, nine plaintiffs alleged that they knew Strauss's conduct was abusive when it occurred. *Id.* at 694. Regardless, as set forth above, the timing of when plaintiffs knew of their own abuse did *not* determine accrual of their heightened risk claims. Rather, plaintiffs' claims accrued only when they discovered the causal connection between their abuse and Ohio State's misconduct. *Id.* at 705.

Coie investigation. *Id.* at 705. The district court agreed, and dismissed the plaintiffs' claims. *See id.* at 697.

The Sixth Circuit reversed, flatly rejecting Ohio State's argument, and holding instead that the relevant benchmark for measuring timeliness under Title IX is the date when the plaintiffs knew or should have known "that Ohio State administrators with authority to take corrective action knew of Strauss's conduct and failed to respond appropriately." *Id.* at 705. The Circuit reached this result in three steps.

First, as a matter of federal law, the "discovery rule" determines when a Title IX claim accrues.[12] *Id.* at 698-99. The Court noted "that other circuits that have reached this issue have applied the discovery rule in Title IX cases," including the Fifth Circuit. *See id.* at 699 (citing *King-White*, 803 F.3d at 762); *accord Dubose v. Kansas City S. Ry. Co.*, 729 F.2d 1026, 1030 (5th Cir. 1984) (the discovery rule delays accrual of a federal cause of action "whenever a plaintiff is not aware of and has no reasonable opportunity to discover the critical facts of his injury and its cause.").

Second, "under the discovery rule, a claim accrues when the reasonable person knows, or in the exercise of due diligence should have known, both his injury and the cause of that injury." *Id.* at 701. "In other words, discovering that a defendant caused an injury is *part* of discovering the injury." *Id.* at 702 (discussing *Rotella v. Wood*, 528 U.S. 549, 555–56 (2000)). Again, the Court noted that "[t]his approach is the same as the seven other circuits to address this issue," including the Fifth Circuit. *Id.* (citing

---

[12] As discussed, *infra*, Louisiana does not recognize the "discovery rule" for purposes of determining when an action accrues. *See Austin v. Abney Mills, Inc.*, 2001-1598 (La. 9/4/02), 824 So. 2d 1137, 1150. This is of no moment here, however, because (again) the accrual date of a Title IX claim is a matter of federal law. *King-White*, 803 F.3d at 762.

*Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001)).

Third, because a Title IX heightened risk claim pins liability to the *university's* action or inaction that resulted in the plaintiff's assault, the claim accrues only when the plaintiff should have reasonably discovered that university authorities knew of the abuser's "conduct and failed to respond appropriately." *Id.* at 705 (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). The Sixth Circuit explained:

> In a Title IX case, a plaintiff's cause of action is against the school based on the school's actions or inactions, not the actions of the person who abused the plaintiff. The institution's conduct is therefore the act providing the basis of a plaintiff's legally cognizable Title IX injury. In other words, a plaintiff could not have been alerted to protect his or her rights through a Title IX suit unless they had reason to believe that the institution did something (or failed to do something) that caused their injury.

*Id.* at 702–03 (quotation marks and citations omitted).

Applying this standard, the *Snyder-Hill* plaintiffs' heightened risk claims survived Rule 12(b)(6) dismissal because they were filed within two years of the announcement of Perkins Coie's investigation, which the plaintiffs' plausibly alleged was the first signal of the causal connection between their injuries and Ohio State's misfeasance. *Id.* at 705-06. In reaching this conclusion, the Sixth Circuit expressly resisted looking beyond the pleadings to determine whether the plaintiffs should have investigated Ohio State's potential misconduct at an earlier date:

> Should the plaintiffs' snippets of knowledge have alerted the typical lay person [sic] to protect his or her rights by investigating further? We cannot say. This is a question of fact—one that is improper to resolve at the motion-to-dismiss stage.

*Id.* at 705–06 (quotation marks and citations omitted).

The Sixth Circuit's *Snyder-Hill* analysis is consistent with the analysis of

multiple district courts to have confronted the same issue of when a heightened risk claim accrues, *including* courts within this Circuit. *E.g.*, *Lozano*, 408 F. Supp. 3d at 900 ("Although Lozano was aware of the existence of an injury when Chafin assaulted her in March and April 2014, it is not evident from the complaint that Lozano was aware of facts that would cause a reasonable person to conclude that there was a causal connection between her assaults and the conduct of Baylor staff and officials, or to seek professional advice on this question."); *Hernandez*, 274 F. Supp. 3d at 617 (plaintiff's knowledge that her attacker had previously assaulted other women was "insufficient to demonstrate that she would have been put on notice to look into Baylor's knowledge of [the attacker]'s history or Baylor's conduct in administering its football program prior to her assault."); *Doe 1*, 240 F. Supp. 3d at 663 ("While it is plausible that Plaintiffs were aware of their heightened-risk claims at the time of their assaults, it is also plausible that they did not have reason to further investigate those claims until [Baylor's alleged causal connection to their assaults came to light]."); *accord Karasek v. Regents of Univ. of California*, 500 F. Supp. 3d 967, 978 (N.D. Cal. 2020) (Orrick, J.) ("[A] plaintiff's Title IX pre-assault claim accrues when the plaintiff knows or has reason to know of the school's policy of deliberate indifference that created a heightened risk of harassment.").

Guided by these well-reasoned authorities, the Court determines that Plaintiff's heightened risk claim accrued when she reasonably should have known of the causal connection between her assault and the misconduct of ULS staff and officials. *See Snyder-Hill*, 48 F.4th at 702-03; *Karasek*, 500 F. Supp. 3d at 978; *Lozano*,

408 F. Supp. 3d at 900; *Hernandez*, 274 F. Supp. 3d at 617; *Doe 1*, 240 F. Supp. 3d at 663; *accord King-White*, 803 F.3d at 762 ("A plaintiff's awareness encompasses two elements: (1) the existence of the injury; and (2) causation, that is, the connection between the injury and the defendant's actions." (quotation marks and alterations omitted)). Here, Plaintiff plausibly alleges that she discovered this connection for the first time on May 26, 2021, when she read the USA Today article that revealed publicly (1) UL Lafayette knew of Silva's April 2015 rape arrest at LSU; (2) UL Lafayette conducted no investigation into Silva's arrest and failed to discover that Silva was previously reported for rape at LSU in the Fall of 2014; (3) UL Lafayette allowed Silva to remain enrolled with minimal sanction (disciplinary probation only) despite Silva's arrest; and (4) UL Lafayette allowed Silva to transfer to Louisiana Tech with a clean record. (Doc. 1 at ¶¶ 128-29). Plaintiff also plausibly alleges that she could not have independently discovered this information even had she tried, particularly given FERPA's general rule that educational institutions may *not* disclose personally identifying information of their students. (*Id.* at ¶ 132). Accordingly, the Court finds that Plaintiff's heightened risk claim plausibly accrued in May 2021, less than one year prior to pursuing this action.

ULS disagrees, arguing that Plaintiff's claim is clearly time-barred because Plaintiff alleges that in December 2018 she discovered a sorority group chat "stating that [Silva] had sexually assaulted other women," and that when she reported her assault to Louisiana Tech, a Tech official (Ms. Flournoy) told her "that the university had been receiving calls and reports about Silva and they were 'waiting for someone

to come forward with an accusation against him.'" (*Compare* Doc. 40-1 at p. 14 *with* Doc. 1 at ¶¶ 106, 111). The Court is not persuaded on the present showing.

First, as alleged, Plaintiff's mere discovery that Silva assaulted other women is not sufficient to put her on notice that *ULS* knew of such attacks yet ignored them. *See Hernandez*, 274 F. Supp. at 616–17 ("That Plaintiff knew Elliott had assaulted other women, however, is insufficient to demonstrate that she would have been put on notice to look into Baylor's knowledge of Elliott's history or Baylor's conduct in administering its football program prior to her assault."). Second, Ms. Flournoy's alleged response to Plaintiff's report is ambiguous, indicating that Louisiana Tech was aware of unspecified "calls and reports" regarding Silva, but was *not* aware of a report rising to an "accusation" of sexual assault. Such a vague remark is not enough to establish "beyond doubt" that Plaintiff's claim accrued *before* she read the USA Today article. *See Abdul-Alim Amin*, 706 F.2d at 640; *Petrobras*, 9 F.4th at 256.

In sum, taking the allegations as true and construing all reasonable inferences in Plaintiff's favor, Plaintiff's heightened risk claim accrued on May 26, 2021, when she read the USA Today article and discovered the connection between Silva's assault and ULS's nonfeasance. *See Snyder-Hill*, 48 F.4th at 702-03; *Lozano*, 408 F. Supp. 3d at 900. Plaintiff filed suit within one year, on May 25, 2022, and her claim is timely.

### c) Plaintiff's post-reporting claim

In cases such as this—alleging pre- *and* post-assault Title IX claims—courts often find that the post-assault claim accrued *before* the pre-assault claim. *See Snyder-Hill*, 48 F.4th at 704. This result follows from the nature of the underlying claims, and the distinction between the (in)action that is being challenged:

> A plaintiff will typically know or have reason to know that a school mishandles their own report of an assault close to the time of the school's inadequate response. But that same plaintiff may have no reason to know of a school's deliberate indifference that gave rise to their heightened-risk claim. It would be unreasonable to conclude that a plaintiff's knowledge that their *individual* complaint was mishandled would reveal that the University has a broad de facto policy of deliberate indifference generally.

*Id.* (quotation marks omitted). The Court does not question this logic in the cases where it has been applied. *E.g., Hernandez*, 274 F. Supp. 3d at 617; *Doe 1*, 240 F. Supp. 3d at 663. But those cases are distinguishable from the facts alleged here.

First, Plaintiff alleges that Silva withdrew from Tech immediately after she reported her rape to Tech administration. (Doc. 1 at ¶ 117). As a result of Silva's withdrawal, Plaintiff was *not* confronted with Silva's ongoing presence on campus and, by extension, was plausibly unaware of Tech's failure to fulfill its duties under Title IX. Additionally, Plaintiff alleges that she learned only upon reading the USA Today article that ULS never investigated or disciplined Silva in connection with Plaintiff's report, *and* that ULS permitted Silva to transfer back to UL Lafayette without any consequence despite having just been reported for rape. Thus, plausibly, Plaintiff only discovered ULS's mishandling of her report on May 26, 2021. *Cf. Hernandez*, 274 F. Supp. 3d at 617 (plaintiff's post-assault claim was time-barred because, upon reporting her assault to university officials, plaintiff "knew of her … continuing vulnerability to [her attacker's] presence on campus," "knew that Baylor had failed to intervene," and knew "the university had actual knowledge of her assault and her continuing vulnerability to [her attacker]").

Second, Plaintiff alleges that just days after reporting her assault, Tech

officials informed her that due to Silva's withdrawal "they would not investigate him or [Plaintiff's] report." At the same time, Tech promised Plaintiff that "if Silva reenrolled at Tech, they would call her back to get her testimony." (Doc. 1 at ¶ 117). Instead, ULS "permitted Silva to [immediately] transfer back to UL Lafayette." (*Id.* at ¶ 118). Thereafter, despite Tech's express assurances, ULS did not "investigate [Plaintiff's] report or Silva," and failed even to inform Plaintiff that she could file a Title IX complaint against Silva at UL Lafayette. (*Id.* at ¶ 119).

The sum of these allegations establishes a plausible basis to conclude that ULS (through Tech) affirmatively misrepresented its intent to investigate Silva, effectively hiding Silva's reenrollment, and preventing Plaintiff from pursuing her post-assault claim. Thus, even if Plaintiff's post-assault claim *accrued* before she read the USA Today article, it was nonetheless plausibly tolled by Louisiana's third category of *contra non valentum* (fraud) because ULS took affirmative action to prevent Plaintiff from pursuing her rights. *See Lomont*, 172 So. 3d at 637. Again, ULS has not conclusively established that Plaintiff's post-assault claim is time-barred. *Abdul-Alim Amin*, 706 F.2d at 640; *Petrobras*, 9 F.4th at 256.

### b. Negligence

#### 1. Plaintiff's negligence claim is adequately alleged

Louisiana Civil Code article 2315 provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." Louisiana adopts a "duty-risk" analysis for assigning tort liability under a negligence theory, requiring Plaintiff to establish that (1) she suffered an injury; (2) ULS owed her a duty of care; (3) ULS breached that duty; (4) the conduct in question was the

35

cause-in-fact of the resulting harm; and (5) the risk of harm was within the scope of protection afforded by the duty breached. *Doe v. McKesson*, 2021-00929 (La. 3/25/22), 339 So. 3d 524, 531. Whether ULS owes Plaintiff a duty is a question of law. *Id.*

Tellingly, ULS offers no argument that Plaintiff's allegations fail the elements of an actionable negligence claim.[13] (*See* Doc. 40-1 at pp. 17-20). The Court, too, is satisfied that Plaintiff's negligence claim is actionable and may proceed.

Instead, ULS baldly asserts that Act 172 "does not provide victims with a cause of action for tort relief," and that "Plaintiff's reliance upon the Act is misplaced and does not support her claim of state law negligence, as plead." (Doc. 40-1 at p. 20). This argument is bizarre, at best. Plaintiff does not allege a cause of action under Act 172; her claim is based on a traditional theory of tort liability under Civil Code article 2315. (Doc. at ¶¶ 150-155; *see also* Doc. 41 at p. 19). Plainly, when assessing this claim, Act 172 may be consulted to determine the source and scope of ULS's duty to Plaintiff. *Jenkins v. Hernandez*, 2019-0874 (La. App. 1 Cir. 6/3/20), 305 So. 3d 365, 372, *writ denied*, 2020-00835 (La. 10/20/20), 303 So. 3d 315.

### 2.  Plaintiff's negligence claim is timely

The same one-year prescriptive period applicable to Plaintiff's Title IX claims

---

[13] Generally speaking, a party waives an issue by failing to adequately brief it. *See United States v. Martinez*, 263 F.3d 436, 438 (5th Cir. 2001). Moreover, the Local Civil Rules require that parties support their arguments with "a concise statement of reasons ... and citations of authorities," M.D. La. LR 7(d), and this Court has repeatedly admonished that it will not speculate on arguments that have not been advanced, or attempt to develop arguments on a party's behalf. *United States v. Grigsby*, No. 19-cv-00596, --- F.Supp.3d ----, 2022 WL 11269773, at *12 (M.D. La. Oct. 19, 2022) (Jackson, J.) (quotation marks omitted). Pursuant to the Court's Local Rules, and consistent with the general rule that a party's failure to adequately brief an issue acts as a waiver, ULS has (for present purposes) waived its challenge to the underlying elements of Plaintiff's negligence claim.

is applicable to her negligence claim, La. C.C. art. 3492, and many of the same principles governing the timeliness of Plaintiff's Title IX claims also apply to Plaintiff's negligence claim. Specifically, Louisiana law also cautions that a prescription defense is not favored at the pleadings stage because "[d]etermination of when prescription commences under the discovery rule is a fact-intensive inquiry." *Bailey v. Khoury*, 2004-0620 (La. 1/20/05), 891 So. 2d 1268, 1284. Likewise, Louisiana law instructs that it is the defendant's burden to prove prescription, and that this burden shifts *only if* the "plaintiff's claim is barred on its face." *Id.*

The only analytical difference between federal law and Louisiana law on this point is that under Louisiana law, the "discovery rule" will *not* prevent a negligence action from *accruing*. *See Austin*, 824 So. 2d at 1150 & n.7. Rather, "for a negligence cause of action to accrue, three elements are required: fault, causation and damages." *Id.* at 1148. Thus, conceivably, Plaintiff's Louisiana negligence claim may have *accrued* prior to her federal Title IX claims, because, in Louisiana, the discovery rule simply does not stop *accrual. Id.* at 1150.

Here, however, this distinction is without difference because even if the discovery rule did not (*could* not) delay accrual of Plaintiff's negligence claim, "*contra non valentem* applies to suspend the running of prescription *on a cause of action already accrued.*" *Austin*, 824 So. 2d at 1149 n.7 (emphasis in original; quotation marks omitted). Specifically, *contra non valentem* "prevents the running of liberative prescription" "where the debtor himself has done some act effactually to prevent the creditor from availing himself of his cause of action," *or* "where the cause of action is

neither known nor reasonably knowable by the plaintiff even though plaintiff's ignorance is not induced by the defendant." *Lomont*, 172 So. 3d at 637. The former applies when "the defendant engages in … concealment, misrepresentation, fraud or ill practice" that reasonably causes the plaintiff to delay pursuing her action. *Marin v. Exxon Mobil Corp.*, 2009-2368 (La. 10/19/10), 48 So. 3d 234, 252. The latter is the equivalent of the discovery rule, and holds that "prescription does not commence until the plaintiff has actual or constructive notice of the tortious act, the resulting damage, and the causal connection between the two." *Jackson v. Ascension Par. Sch. Bd.*, 573 So. 2d 501, 503 (La. App. 1 Cir. 1990), *writ denied*, 569 So. 2d 989 (La. 1990); *LeCompte v. State-Dep't of Health & Hum. Res.-S. Louisiana Med. Ctr.*, 97-1878 (La. App. 1 Cir. 9/25/98), 723 So. 2d 474, 476 (same, citing authorities); *accord Ducre v. Mine Safety Appliances*, 963 F.2d 757, 760 (5th Cir. 1992).

Applying Louisiana's framework, even if Plaintiff's negligence action accrued more than one year before she filed suit, she has plausibly alleged facts establishing that prescription was tolled by *contra non valentum* until she read the USA Today article in May 2021. The Court has already exhaustively set forth the essential basis for this determination as it relates to Plaintiff's Title IX claims, and incorporates that analysis here. Suffice for now to say that Plaintiff's claim related to ULS's pre- *and* post-reporting negligence is saved from prescription by the fourth category of *contra non valentum* (the discovery rule) because she has plausibly alleged that she could not reasonably know "the causal connection" between her assault and ULS's pre- and post-reporting misconduct until she read the USA Today article. *Jackson*, 573 So. 2d

at 503. Additionally, Plaintiff's claim related to ULS's post-reporting negligence is saved from prescription by the third category of *contra non valentum* (fraud) because she has plausibly alleged that ULS (through Tech) affirmatively misrepresented its intent to investigate Silva, even allowing Silva to transfer back to UL Lafayette without consequence, effectively hiding Silva's reenrollment and preventing Plaintiff from pursuing her post-assault claim.

### 3. ULS is not entitled to immunity

Finally, ULS asserts immunity from Plaintiff's negligence claim pursuant to Act 172's newly added (2021) "Immunities" section, which states that "[a] person acting in good faith who ... assists in the investigation of a report of an incident of power-based violence ... [s]hall be immune from civil liability ... that might otherwise be incurred or imposed as a result of those actions." La. R.S. § 17:3399.13.2(A)(1). This argument fails for two reasons.

First, Louisiana law is clear that "[i]n the absence of contrary legislative expression, substantive laws apply prospectively only." La. C.C. art. 6; *accord* La. R.S. § 1:2 ("No Section of the Revised Statutes is retroactive unless it is expressly so stated."). The events at issue here occurred before the effective date of § 17:3399.13.2—June 29, 2021—and ULS provides no argument or authority whatsoever for the immunity's retroactive application. Again, issues that are not briefed are waived. *Supra* n.13.

Second, and in any event, by its terms, Act 172's immunity is only available to

"[a] person[14] acting in *good faith* who ... *assists* in the investigation of a report." La. R.S. § 17:3399.13.2(A)(1) (emphasis added). Here, Plaintiff alleges that ULS conducted no investigation of Silva whatsoever, effectively turning a blind eye after learning of Silva's April 2015 rape arrest *and again* after learning of Plaintiff's September 2018 rape. Thus, plausibly, a basis exists to conclude that ULS did *not* act in "good faith" or even, for that matter, "assist" in an investigation of these reports. Either way, Plaintiff's "claim for relief is sufficiently plausible to allow [her] to proceed to discovery." *McKesson*, 339 So. 3d at 532.

### iii.   LCG

#### a.   Plaintiff's negligence claim is adequately alleged

LCG challenges only the duty element of Plaintiff's negligence claim, arguing that LPD's duty to report sexual offenses involving UL Lafayette students (created by Act 172 and the Lafayette MOU) is owed only "to UL Lafayette, rather than plaintiff." (Doc. 22-1 at pp. 20-24).[15] This argument also fails.

Under Louisiana law, a defendant's duty of care may arise from statute, jurisprudence, or even "general principles of fault." *Jenkins*, 305 So. 3d at 372. Most relevant here, the Louisiana Supreme Court instructs that there is a "universal duty on the part of the defendant in negligence cases to use reasonable care so as to avoid

---

[14] The Court does not consider at this stage Plaintiff's alternative argument that ULS is not a "person" within the meaning of § 17:3399.13.2. (*See* Doc. 41 at p. 26).

[15] LCG also argues that Plaintiff's claim fails because Act 172 does not create a private right of action. (Doc. 22-1 at pp. 11-13). Again, this argument fails because Plaintiff has not alleged a private right of action under Act 172; she alleges a traditional negligence claim. And again, the Court plainly may consider Act 172 to determine the source and scope of any duty owed by LCG to Plaintiff. *Jenkins,* 305 So. 3d at 372.

injury to another." *McKesson*, 339 So. 3d at 531 (quoting *Boykin v. La. Transit Co.*, 707 So.2d 1225, 1231 (La. 1998)). To the point, a defendant owes "a duty not to negligently precipitate the crime of a third party." *Id.* at 532.

Applying these principles, Plaintiff has satisfied the duty element for present purposes. Act 172 requires universities and local law enforcement agencies to enter into agreements "to share information in accordance with applicable federal and state confidentiality laws, including but not limited to trends about sexually-oriented criminal offenses occurring against students of the [university]." La. R.S. § 3399.14(A) (2015). It further requires law enforcement agencies to state on their reports "the status of the alleged victim as a [university] student." *Id.* § 3399.14(A). The purpose of this legislation is unambiguous: "to improve campus safety" by coordinating responses to incidents of sexual assault involving students, reducing the likelihood of additional offenses. *Id.* § 3399.14(C)(4).

Act 172 became law on June 23, 2015. Eighteen months passed without an MOU between UL Lafayette and the Lafayette PD. Plaintiff alleges that, in the meantime, a female community college student ("Student 3") reported Silva to LPD for secretly video-taping a consensual sexual encounter and later blackmailing her with it. (Doc. 1 at ¶ 68). At the time, Silva was on probation at UL Lafayette due to his rape arrest. (*Id.*). LPD did not share this report with UL Lafayette. (*Id.* at ¶ 72).

Eventually, on January 17, 2017, LPD executed the Lafayette MOU. The MOU's express purpose is to "shar[e] information specific to [sexually-oriented criminal offenses] involving University of Louisiana at Lafayette as required by [Act

41

172]," and LPD expressly agreed to "[n]otify UL Lafayette's Title IX Coordinator, to the extent we are able with respect to any confidentiality requirements, of any report of a sexually oriented criminal offense that may have occurred on its campus or involved a student as a victim or an accused." (Doc. 22-3 at pp. 1, 4).

Plaintiff alleges that still, even after executing the Lafayette MOU, LPD shirked its duty to share information—*twice*. In April 2018, a female UL Lafayette student ("Student 4") reported that Silva groped and vaginally penetrated her. (Doc. 1 ¶ 69).[16] LPD referred Student 4's report to the 14th Judicial District Attorney's Office for a charging decision, but did not inform UL Lafayette of the same. (*Id.*).

Two months later, in June 2018, another female UL Lafayette student ("Student 5") reported that Silva sexually assaulted her in 2010, when they were both 14 years old, on the morning of their freshman high school orientation. (Doc. 1 at ¶ 70). Allegedly, Student 5 finally came forward because she recently learned of yet *another* incident of sexual assault involving Silva, against a separate victim. (*Id.* at ¶ 71). Again, LPD failed to share this report with UL Lafayette. (*Id.* at ¶ 72).

Plaintiff alleges that "just weeks after Lafayette PD received the third [June 2018] report regarding Silva's criminal sexual conduct, Silva transferred to Tech with a clean academic record that did not mention he had been on disciplinary probation as a result of his rape arrest in Baton Rouge." (Doc. 1 at ¶ 75). Plaintiff further alleges that, at Tech, Silva predictably continued his sexual predation, raping her within the

---

[16] Plaintiff alleges that Student 4 met Silva through Silva's employment at the UL Lafayette high school tutoring program. (Doc. 1 ¶ 69).

first month of his arrival. (*Id.* at ¶¶ 76-105).

At all times, Lafayette PD owed Plaintiff an unambiguous "duty not to negligently precipitate the crime of a third party." *McKesson*, 339 So. 3d at 532. Plaintiff plausibly alleges that LPD breached exactly this duty, by failing on three occasions to disclose reports of sexual assault against Silva to UL Lafayette, as required by Act 172. La. R.S. § 3399.14(A) (2015). LPD's second and third alleged breach came *after* LPD executed the Lafayette MOU, where LPD expressly memorialized its obligations under Act 172, and specifically agreed to "[n]otify UL Lafayette's Title IX Coordinator, to the extent we are able with respect to any confidentiality requirements[17], of any report of a sexually oriented criminal offense that may have … involved a student as a victim or an accused." (Doc. 22-3 at pp. 1, 4).[18] Certainly, a jury could plausibly find that Silva's predatory assault of Plaintiff "was a foreseeable effect" of LPD's negligent failure to share *three* prior reports of sexual assault against Silva. *McKesson*, 339 So. 3d at 532.

Plaintiff has also plausibly alleged that LPD's breach of duty was the cause-in-fact of her injury (rape), and that her injury was within the scope of the duty breached

---

[17] Whether "confidentiality requirements" prevented Lafayette PD from sharing the reports against Silva with UL Lafayette plainly demands evidentiary development and cannot be decided at this stage.

[18] The parties have not briefed whether the Lafayette MOU created a *stipulation pour autrui* in Plaintiff's favor, and the Court does not decide that issue here. Certainly, the standard for a *stipulation pour autroi* is high. *See Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1147 (5th Cir. 1993). Nonetheless, the Louisiana Supreme Court has long-recognized *stipulations pour autroi* "in favor of the general public," *Oliff v. City of Shreveport*, 27 So. 688, 697 (La. 1900); *Lawson v. Shreveport Waterworks Co.*, 35 So. 390, 392 (La. 1903), and the fact that Plaintiff may yet prove a *stipulation pour autroi* under the Lafayette MOU reinforces the Court's determination that Plaintiff has plausibly alleged that LPD owed a duty to share reports of Silva's sexual assaults with UL Lafayette.

by LPD. Plaintiff alleges that Silva was a *known* sexual predator, with *three* strikes against him at LPD, *two* strikes against him at LSU (the Fall 2014 rape report and the April 2015 rape arrest), and *one* strike against him at UL Lafayette (the April 2015 rape arrest). Act 172 was intended "to improve campus safety" by requiring communication among local law enforcement and universities so that sexual predators are removed from campus before they strike again. La. R.S. § 3399.14(C)(4). Certainly, it is plausible that Silva would (or at least *should*) have been investigated and expelled from UL Lafayette—and *not* allowed to transfer to Tech—had LPD shared the three known reports against him with UL Lafayette's Title IX coordinator. Thus, LPD's negligent actions were plausibly the "but for" cause of Plaintiff's injury. *See McKesson*, 339 So. 3d at 532. Furthermore, because LPD's duty to share reports of sexual assault with UL Lafayette was intended to prevent foreseeable sexual assaults among college students, Plaintiff's injury, as alleged, was within the scope of the duty of care allegedly breached by LPD.

In sum, at this stage the Court finds that Plaintiff has plausibly alleged that LPD owed a duty to provide UL Lafayette information regarding Silva's three prior reported sexual assaults, and that Plaintiff's rape was the "patently foreseeable" result of LPD's breach of this duty. *McKesson*, 339 So. 3d at 531. As such, Plaintiff must be afforded the opportunity to fully develop the evidence in support of her claim. *See McKesson*, 339 So. 3d at 533 ("[I]n ruling on an exception raising the objection of no cause of action, the court must determine whether the law affords any relief to the claimant if he proves the factual allegations in the petition at trial and any reasonable

44

doubt concerning the sufficiency of the petition must be resolved in favor of finding that a cause of action has been stated." (quotation marks omitted)).

### b. Plaintiff's negligence claim is timely

Next, LCG argues that Plaintiff's claim is prescribed because after observing the sorority group chat warning of Silva and reporting her own rape in December 2018, a reasonable person in Plaintiff's position would "file a public records request" and "consult legal counsel to protect her civil suit." (Doc. 22-1 at p. 19). LCG insists that by having failed to take either of these steps, Plaintiff did not exercise "the reasonable diligence required for the application of *contra non valentem*" and "cannot meet her burden to show that prescription was suspended or interrupted." (*Id.*).

LCG's assertion that Plaintiff should have immediately filed a public records request is a nonstarter. First, LCG fails to explain what information such a request would have revealed. Issues not briefed are waived. *Supra* n.13. Without this information, the Court cannot begin to properly assess LCG's defense.

Additionally, when he attacked Plaintiff, Silva was a student at Tech, and there is nothing on the face of the Complaint to indicate that, prior to the USA Today article, Plaintiff knew Silva was ever enrolled at UL Lafayette (either before or after her rape), much less that any UL Lafayette students had previously reported him to LPD for assault. Thus, plausibly, a reasonable person in Plaintiff's situation would *not* even think to obtain information from LCG through a public records request.

LCG's argument that Plaintiff should have hired an attorney after her rape is equally unpersuasive. The only authority LCG cites for this rule is *Farmer v. D & O Contractors, Inc.*, No. 14-1945, 2015 WL 1184508, at *4 (E.D. La. Mar. 13, 2015)

45

(Africk, J.), a District Court order addressing a federal limitations defense aimed at a federal civil RICO claim. *Farmer* is inapposite on all levels. First, a federal civil RICO claim is distinguishable for limitations purposes, because the RICO limitations period begins to run solely upon "discovery of the injury." *Rotella v. Wood*, 528 U.S. 549, 555 (2000). By contrast, *contra non valentum* tolls prescription for a Louisiana negligence claim until "the plaintiff has actual or constructive notice of the tortious act, the resulting damage, and the causal connection between the two." *Jackson*, 573 So. 2d at 503; *LeCompte*, 723 So. 2d at 476.

Second, in *Farmer*, the Court ruled at summary judgment—after development of an evidentiary record—that the plaintiff's delay was unreasonable where plaintiff (1) actively assisted the FBI in the underlying criminal RICO investigation, and (2) *assumed* that his civil RICO claim was timely *if* filed after the criminal investigation concluded, based on bad advice from a FBI *agent. See Farmer*, 2015 WL 1184508, at *4. The plaintiff's *assumption*—just as much as his failure to consult counsel—was the driving factor in the Court's decision. *See id.* ("Making such an assumption is not the hallmark of diligence—consultation with a competent attorney would have advised Farmer of the time limitations on his claims before they became an issue."). The same factors are not alleged here.

Third, not surprisingly, no Louisiana case has *ever* cited *Farmer*, much less for the proposition that prescription expires *before* the plaintiff learns the causal connection between the defendant's act(s) and her injury *unless* she consults an attorney in the meantime. Nor has LCG identified any Louisiana case that applies

such a rule. To the contrary, the Louisiana Supreme Court instructs that "[p]rescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong," and has expressly "rejected the idea that prescription principles should be used to force a person who believes he may have been damaged in some way to rush to file suit against all parties who might have caused that damage." *Bailey*, 891 So. 2d at 1285 (quotation marks omitted). Accepting LCG's arguments at this stage, without an evidentiary record, would violate these principles. *See id.*

Essentially for the same reasons set forth above regarding ULS, the Court finds that Plaintiff's Complaint establishes a plausible basis for tolling under the *contra non valentum* discovery rule, until she read the USA Today article and learned that Silva was previously a UL Lafayette student, where he was reported to LPD *three* times for sexual assault.

### c.  LCG is not entitled to immunity

LCG also invokes Act 172's newly enacted Immunities clause. (Doc. 22-1 at pp. 24-25). And, like ULS, LCG provides no argument establishing the immunity's retroactive application to its alleged conduct, effectively waiving the defense.

Finally, LCG invokes "discretionary acts" immunity under La. R.S. § 9:2798.1B. (Doc. 22 at pp. 25-26). This gambit also fails. When "a statute, regulation, or policy prescribes a particular course of action, there is no choice or discretion involved, and the immunity does not apply." *Doe v. ABC Sch.*, 2019-0983 (La. App. 1 Cir. 12/17/20), 316 So. 3d 1086, 1099, *writ denied*, 2021-00098 (La. 3/9/21), 312 So. 3d 582. Here, Plaintiff plausibly alleges that Act 172 and the Lafayette MOU *required*

LPD to share reports of sexual assault against Silva with UL Lafayette, *regardless* of whether LPD ultimately referred the reports to the District Attorney's office. Lacking any discretion under the law or LPD's own policy (the MOU), LCG cannot attribute LPD's operational failure to a "policy making or ministerial" decision. *See id.* at 1099-1100 (discretionary act immunity did not apply to school board's failure to conduct criminal background check of janitor that sexually assaulted student because "[t]he School Board's independent liability was not at the policy making or ministerial level but rather at the operational level for which no immunity applies").

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** that **LSU's Motion To Dismiss Pursuant To Federal Rule Of Civil Procedure 12(b)(1) For Lack Of Subject Matter Jurisdiction (Doc. 23)** is **GRANTED**.

**IT IS FURTHER ORDERED** that **LCG's Motion To Dismiss For Failure To State A Claim Upon Which Relief May Be Granted (Doc. 22)** is **DENIED**.

**IT IS FURTHER ORDERED** that **ULS's Motion To Dismiss Pursuant To Rule 12(c) (Doc. 40)** be and is hereby **DENIED**.

Separately, the Court will issue a partial judgment dismissing LSU from this action.

Baton Rouge, Louisiana, this 10th day of January, 2023

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

48