## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**JANE DOE**                                                         **CIVIL ACTION**

**VERSUS**

**BOARD OF SUPERVISORS OF THE**                    **NO. 22-00338-BAJ-SDJ**
**UNIVERSITY     OF     LOUISIANA**
**SYSTEM, ET AL.**

### <u>RULING AND ORDER</u>

Before the Court are Defendant Board of Supervisors of the University of Louisiana System's **Motion for Summary Judgment (Doc. 198)** and Plaintiff Jane Doe's **Motion for Partial Summary Judgment (Doc. 193)** (collectively, the "Motions"). The Motions are opposed. (Doc. 204; 210). The parties have filed Reply Briefs. (Doc. 216; Doc. 219).

For the reasons below, Plaintiff's Motion (Doc. 193) will be **GRANTED**. Defendant Board of Supervisors of the University of Louisiana System's Motion (Doc. 198) will be **DENIED.**

## I.    BACKGROUND

The following facts are uncontested for purposes of summary judgment, either because the opposing party has admitted the fact or because the opposing party failed to adequately contest it:

### A. The Board of Supervisors for the University of Louisiana System ("ULS") Controls the University of Louisiana at Lafayette ("ULL") and Louisiana Tech ("Tech").

The Louisiana Constitution created the Board of Supervisors for the University of Louisiana System ("ULS"). (Doc. 193-2 at ¶ 2; Doc. 204-1 at ¶ 2; La. Const. art. VIII, § 6(A)). ULS is vested with the "authority to exercise power necessary to supervise and manage the day-to-day operations of institutions of postsecondary education under its control." (Doc. 193-2 at ¶ 3; Doc. 204-1 at ¶ 3). ULS supervises, operates, manages, and controls the University of Louisiana at Lafayette ("ULL") and Louisiana Tech ("Tech"). (Doc. 193-2 at ¶ 4; Doc. 204-1 at ¶ 4). ULS receives federal funds within the meaning of Title IX. (Doc. 193-2 at ¶ 5; Doc. 204-1 at ¶ 5).

### B. Relevant ULL Administrators Include Perez, Tapo, and LeDay.

Margarita Perez has served as the ULL Dean of Students since January 2015. (Doc. 193-2 at ¶ 6; Doc. 204-1 at ¶ 6). Perez supervises many ULL departments, including a ULL department called Student Rights and Responsibilities, which is responsible for implementing the Code of Student Conduct (the "Code"), adjudicating cases involving the Code, and otherwise maintaining the Code. (Doc. 193-2 at ¶ 7; Doc. 204-1 at ¶ 7).

Carl Tapo joined ULL's staff in 2005, serving as the Assistant Dean of Students until 2014. (Doc. 193-2 at ¶ 9; Doc. 204-1 at ¶ 9). Tapo then served as the Associate Dean of Students and Interim Director of Student Life and Conduct from 2014 to

December 2017 or January 2018.[1] (Doc. 193-2 at ¶¶ 8–9; Doc. 204-1 at ¶¶ 8–9). Perez has served as Tapo's direct supervisor since January 2015. (Doc. 193-2 at ¶ 10; Doc. 204-1 at ¶ 10).

The ULL Student Life and Conduct Department was responsible for overseeing and processing student violations of the Code. (Doc. 193-5 at 23:1-3, 23:15–19). According to Tapo's job description, which Tapo testified accurately reflected his responsibilities, Tapo served as ULL's "chief disciplinary officer." (Doc. 193-5 at 26:10–23). Tapo "direct[ed] overall operations of the student conduct system for undergraduate and graduate students for cases of academic and nonacademic misconduct." (*Id.*).

Teressa LeDay began working as ULL's Title IX Coordinator on August 7, 2018, and this was the first time she worked as a Title IX Coordinator.[2] (Doc. 193-2 at ¶ 16; Doc. 204-1 at ¶ 16; Doc. 216-3 at 9:6–8). Before starting as ULL's Title IX coordinator, LeDay had no training on investigating sexual harassment reports under Title IX. (Doc. 193-2 at ¶ 18; Doc. 204-1 at ¶ 18).

---

[1] This department was also known as the Student Rights and Responsibilities Department.

[2] ULS contests that this was LeDay's first time working as a Title IX Coordinator. LeDay herself testified, however:

> Q. So August of 2018 was the first time that you worked as a Title IX Coordinator, correct?

> A. That's correct.

(Doc. 216-3 at 9:6–8).

### C. Relevant Tech Administrators Include Guice, Flournoy, Crawford, and Collins.

Leslie Guice served as Tech's President from July 1, 2013, to December 2023. (Doc. 193-2 at ¶ 19; Doc. 204-1 at ¶ 19). Carrie Flournoy served as Executive Assistant to the President and Title IX Coordinator from 2013 to 2021. (Doc. 193-2 at ¶ 20; Doc. 204-1 at ¶ 20). President Guice was Flournoy's direct supervisor in her role as Part-Time Title IX Coordinator. (Doc. 193-2 at ¶ 21; Doc. 204-1 at ¶ 21).

In Flournoy's role as Title IX Coordinator, she was tasked with "[o]versee[ing] monitoring of University policy in relation to Title IX law developments; [and] implementation of grievance procedures under Title IX; including notification, investigation, and disposition of complaints" when the complaint fell under Title IX. (Doc. 193-2 at ¶ 23; Doc. 204-1 at ¶ 23).

During the 2018–2019 academic year, Flournoy was the sole investigator and decisionmaker at Tech for any sexual harassment claim that fell under Title IX. (Doc. 193-2 at ¶ 24; Doc. 204-1 at ¶ 24). Flournoy testified that she kept "Dr. Guice abreast of complaints that were happening, [and] specific changes within Title IX regulations, rules, [and] policies." (Doc. 193-9 at 42:2–6).

Flournoy's duties and responsibilities included overseeing meetings and distribution of information regarding "University of Louisiana System policy, [Board of Regents] policies, various federal and state laws, etc., to ensure compliance." (Doc. 193-2 at ¶ 26; Doc. 204-1 at ¶ 26). It was Flournoy's job to update Tech's Title IX and sexual harassment policy, "Policy 1436," to ensure compliance with federal and state regulations. (Doc. 193-9 at 45:8–21). Flournoy was unaware of any approval

4

process for those updates and believed that such changes were reviewed and approved by Tech's President. (*Id.* at 45:22–46:6).

Flournoy believed that complaints falling under Title IX would arise only from on-campus incidents. (*Id.* at 52:12–53:7). Flournoy believed she had no obligation to investigate or otherwise follow up on any complaint arising from off-campus incidents. (*Id.* at 55:19–56:3). Flournoy later testified, however, that certain off-campus rapes could give rise to Title IX complaints requiring investigation, should those rapes involve a student group like "Tech abroad." (Doc. 204-7 at 124:17–23).

Flournoy testified that during the 2018–2019 academic year, Tech's policy was that if a Tech student reported that they were raped by another Tech student off-campus, it was not Flournoy's responsibility as Title IX coordinator to investigate or otherwise follow up on the complaint. (*Id.*). Flournoy never sought any type of legal guidance with respect to this policy. (*Id.* at 56:5–56:7). Tech did not hire its first full-time Title IX coordinator until 2021. (Doc. 193-2 at ¶ 22; Doc. 204-1 at ¶ 22).

Dickie Crawford has worked for Tech since 1994. (Doc. 193-2 at ¶ 31; Doc. 204-1 at ¶ 31). From 2017–2019, Crawford served as the Assistant Vice President for Student Advancement at Tech. (Doc. 193-2 at ¶ 32; Doc. 204-1 at ¶ 32). In this role, Crawford was responsible for supervising the Chief of University Police, Randall Hermes, and supervising the Director of Student Conduct and Academic Integrity, who oversaw student disciplinary issues. (Doc. 193-2 at ¶ 33; Doc. 204-1 at ¶ 33).

Tech first employed Adam Collins in 2008. (Doc. 193-2 at ¶ 34;

Doc. 204-1 at ¶ 34). Collins became the Director of Student Conduct and Academic Integrity in 2014, a position he held at the time of his deposition in October 2023. (Doc. 193-2 at ¶ 35; Doc. 204-1 at ¶ 35). Since 2014, Collins has been responsible for providing a "fair and impartial" adjudication process for students and organizations that have allegedly violated Tech's Code of Student Conduct. (Doc. 193-2 at ¶ 36; Doc. 204-1 at ¶ 36).

### D. Relevant Laws and Policies, and ULL and Tech Officials' Knowledge Regarding Same.

The following laws and policies are applicable to the Motions.

#### i. Executive Order No. BJ 2014-14: Uniformity of Policies Related to the Crime of Sexual Assault.

On October 20, 2014, the Louisiana Governor's office issued Executive Order No. BJ 2014-14, entitled "Uniformity of Policies Related to the Crime of Sexual Assault" ("EO-2014-14" or "Order"). (Doc. 193-2 at ¶ 37; Doc. 204-1 at ¶ 37). The Order declared that "sexual assault is a horrendous crime that creates physical and emotional damage to victims, for which special measures must be taken by every public officer and agency in this state in order to bring the perpetrators to justice and assist the victims in their recovery[.]" (Doc. 193-2 at ¶ 38; Doc. 204-1 at ¶ 38). The Order noted that "public postsecondary education institutions under the Board of Regents in this state have separately implemented measures to address the reporting of sexual assault on their campuses, and the prevention of such crimes," but that "these separate measures implemented by the individual public postsecondary education institutions, while well-intentioned, are in some cases outdated and create

a fractured approach to this critical issue that would benefit from a statewide uniformity of best practices that can be provided by the Board of Regents exercising its constitutional authority to coordinate among these institutions." (Doc. 193-2 at ¶ 39; Doc. 204-1 at ¶ 39).

The Order continued, stating that "it is incumbent upon the public officers and agencies, with a role to play in bringing the perpetrators to justice and assisting the victims in their recovery, to coordinate their efforts to ensure that this vital issue is addressed immediately." (Doc. 193-2 at ¶ 40; Doc. 204-1 at ¶ 40). EO-2014-14 ordered and directed the Louisiana Board of Regents to "coordinate uniform policies and best practices among the public postsecondary education institutions to implement measures to address the reporting of sexual assault on their campuses, the prevention of such crimes, and the medical and mental health care needed for these victims." (Doc. 193-2 at ¶ 41; Doc. 204-1 at ¶ 41).

### ii. Act 172 – Campus Accountability and Safety Act.

On June 23, 2015, Act 172, also called the Campus Accountability and Safety Act ("Act 172"), became effective. La. R.S. § 17:3399.11 (2015), *et seq*. (Doc. 193-2 at ¶ 42; Doc. 204-1 at ¶ 42). It stated that "[t]he Board of Regents' Uniform Policy on Sexual Assault shall require that institutions communicate with each other regarding transfer of students against whom disciplinary action has been taken as a result of a code of conduct violation relating to sexually-oriented criminal offenses." (Doc. 193-2 at ¶ 43; Doc. 204-1 at ¶ 43).

Act 172 required the Board of Regents to require that "institutions withhold transcripts of students seeking a transfer with pending disciplinary action relative to

sexually-oriented criminal offenses, until such investigation and adjudication is complete." (Doc. 193-2 at ¶ 44; Doc. 204-1 at ¶ 44).

Act 172 continues, stating:

Each institution and law enforcement and criminal justice agency located within the parish of the campus of the institution shall enter into a memorandum of understanding to clearly delineate responsibilities and share information in accordance with applicable federal and state confidentiality laws, including but not limited to trends about sexually-oriented criminal offenses occurring against students of the institution.

(Doc. 193-2 at ¶ 45; Doc. 204-1 at ¶ 45).

The requirements for each memorandum of understanding was to include:

(a) Delineation and sharing protocols of investigative responsibilities.

(b) Protocols for investigations, including standards for notification and communication and measures to promote evidence preservation.

(c) Agreed-upon training and requirements for the parties to the memorandum of understanding on issues related to sexually-oriented criminal offenses for the purpose of sharing information and coordinating training to the extent possible.

(d) A method of sharing general information about sexually-oriented criminal offenses occurring within the jurisdiction of the parties to the memorandum of understanding in order to improve campus safety.

(Doc. 193-2 at ¶ 46; Doc. 204-1 at ¶ 46). Act 172 declared that "[t]he local law enforcement agency shall include information on its police report regarding the status of the alleged victim as a student at an institution as defined in this Part." (*Id.* at ¶ 47).

ULL Associate Dean of Students and Interim Director of Student Life and Conduct Tapo does not recall ever hearing of Act No. 172 or its transitive requirement

that schools communicate with each other regarding the transfer of students with pending disciplinary action related to a code of conduct violation arising from a sexually oriented criminal offense. (Docs 193-2. at ¶ 48; Doc. 204-1 at ¶ 48). ULL Dean of Students Perez could not recall receiving any training on Act 172. (Doc. 193-2 at ¶ 49; Doc. 204-1 at ¶ 49).

Tech Vice President for Student Advancement Crawford also testified that he had not heard of Act 172. (Doc. 193-2 at ¶ 55; Doc. 204-1 at ¶ 55). Tech Director of Student Conduct and Academic Integrity Adam Collins had similarly not heard of Act 172. (Doc. 193-2 at ¶ 56; Doc. 204-1 at ¶ 56). Flournoy could not recall any steps she took to ensure that Tech complied with Act 172. (Doc. 193-2 at ¶ 51; Doc. 204-1 at ¶ 51).

ULL Title IX Coordinator LeDay has never communicated with Tech Title IX Coordinator Flournoy regarding students who were reported or found responsible for sexual harassment. (Doc. 193-2 at ¶ 50; Doc. 204-1 at ¶ 50; Doc. 193-6 at 54:25–55:8). Flournoy never communicated with Tapo about student sexual harassment. (Doc. 193-2 at ¶ 52; Doc. 204-1 at ¶ 52; Doc. 193-9 at 98:11–14). Flournoy never communicated with the Ruston Police Department regarding a report of a student perpetrating or being the victim of sexual assault, and she did not know of anyone at Tech designated to communicate such information to the Ruston Police. (Doc. 193-2 at ¶ 53; Doc. 204-1 at ¶ 53). Flournoy did not know who served as the Title IX Coordinator at ULL or any other school managed by ULS—except for those at

9

University of Louisiana at Monroe and Grambling State University—prior to 2021. (Doc. 193-2 at ¶ 54; Doc. 204-1 at ¶ 54).

### iii. Louisiana Board of Regents' Uniform Policy on Sexual Misconduct.

The Louisiana Board of Regents' amended Uniform Policy on Sexual Misconduct in accordance with EO-2014-14 and Act 172 ("Uniform Policy") became effective on August 26, 2015. (Doc. 193-2 at ¶ 57; Doc. 204-1 at ¶ 57). The Board of Regents required that all Louisiana public postsecondary management boards and institutions have policies that complied with federal and state laws, including but not limited to Title IX and Act 172. (Doc. 193-2 at ¶ 58; Doc. 204-1 at ¶ 58). The Uniform Policy stated: "[e]ach management board, as the entity with the authority over the day-to-day operations of its member institutions, shall make all due diligence efforts to monitor its member institutions' compliance with applicable laws and regulations," which included but was not limited to Title IX and Act 172. (Doc. 193-2 at ¶ 59; Doc. 204-1 at ¶ 59).

The Uniform Policy stated that "[e]ach institution. . . shall begin establishing policies and procedures in full compliance with this Amended Policy immediately and shall implement those policies no later than October 30, 2015." (Doc. 193-13 at 4). It also stated: "[i]f a student accused of a sexually-oriented criminal offense seeks to transfer to another institution during an investigation, the institution shall withhold the student's transcript until such investigation or adjudication is complete and a final decision has been made. Each institution shall inform the respondent of the

institution's obligation to withhold the transcript during the investigation." (*Id.* at 21). The Uniform Policy continues:

> If the student is found responsible for sexually-oriented criminal offenses upon the completion of such investigation and/or adjudication and seeks to transfer to another institution, institutions are required to communicate such a violation, when the institution becomes aware of the student's attempt to transfer, with the institution(s) to which the student seeks to transfer or has transferred.

(Doc. 193-2 at ¶ 62; Doc. 204-1 at ¶ 62).

The Uniform Policy also provided, "each institution shall make diligent efforts to enter into [a] Memorandum of Understanding with law enforcement and criminal justice agencies in the parish in accordance with Act 172 or any other applicable state laws." (Doc. 193-2 at ¶ 63; Doc. 204-1 at ¶ 63).

From 2015 to 2020, ULL Dean Perez had the ability to request that the Registrar record a disciplinary action on a student transcript. (Doc. 193-2 at ¶ 64; Doc. 204-1 at ¶ 64). Perez testified that from 2015–2020, ULL never recorded a disciplinary action on a student's transcript because it was not ULL's policy to do so. (Doc. 193-4 at 83:16–84:5).

Tapo testified at his deposition that he had never heard of the Louisiana Board of Regents' Uniform Policy. (Doc. 193-5 at 56:7–10). Tapo testified that he did not recall ever being informed of the Uniform Policy's requirement that, if a student is "found responsible for sexually oriented criminal offenses on the completion of such investigation and/or adjudication and seeks to transfer to another institution, institutions are required to communicate such a violation, when the institution

11

becomes aware of the student's attempt to transfer, with the institution(s) to which the student seeks to transfer or has transferred." (*Id.* at 56:11–57:1). [3]

Tapo, when asked if he was required to inform another university of a transferring ULL student having been found responsible of a sexual misconduct offense, stated that he "refuse[d] to speculate." (Doc. 193-5 at 57:7–18). [4] Tapo stated that he makes no effort to determine whether students who are found responsible for violation of the Code of Student Conduct with respect to sexual misconduct seek to transfer from ULL because, as he testified, "I have no reason to. We offer very good education at UL Lafayette. I would assume any student who comes to us would want to stay." (*Id.* at 58:10–19).

At her first deposition, LeDay was asked if she had "ever seen the Louisiana Board of Regents' uniform policy on sexual misconduct." (Doc. 193-6 at 58:25–59:3). She responded that she had not. (*Id.*). Counsel then showed LeDay the Uniform Policy, and LeDay stated that it did not refresh her recollection as to whether she had ever seen the Uniform Policy. (*Id.* at 59:11–17). Months later, at her second deposition, she stated that she had seen Act 172, which was the impetus behind the

---

[3] ULS acknowledges that this was Tapo's testimony, but argues that it should be stricken as irrelevant because the Uniform Policy was not in effect when Tapo disciplined Silva. (Doc. 204-1 at ¶¶ 66–67). Tapo's awareness of the Uniform Policy is relevant to the adequacy of ULL's Title IX adjudication process, as Tapo was responsible for disciplinary matters at ULL until 2017 or 2018.

[4] The Uniform Policy, again, emphatically and unambiguously states that should students found guilty of criminal sexually-oriented offenses seek to transfer, the original university is *required* to communicate such a violation to the destination school upon becoming aware of the impending transfer.

Uniform Policy, when she started in 2018 and stated that her previous ignorance was based on a misunderstanding of Plaintiff's counsel's question as pertaining to the Board of Regents' obligation. (Doc. 204-6 at 39:7–40:3).

LeDay was not aware of any measures that ULS took to monitor ULL's compliance with Title IX before 2021. (Doc. 193-6 at 58:12–15).

Flournoy, who was specifically tasked with ensuring that Tech followed Board of Regents' policies in her role as Title IX Coordinator, testified that she did not recall what steps, if any, she took to ensure Tech was complying with the Uniform Policy's direction on transfers. (Doc. 193-9 at 64:4–11). To Flournoy's knowledge, Tech did not make the transfer provision a part of its official policies while she was Title IX coordinator. (Doc. 193-9 at 64:12–65:11).

Crawford likewise had never recalled hearing about the Uniform Policy. (Doc. 193-2 at ¶ 73; Doc. 204-1 at ¶ 73). Collins was not familiar with the Louisiana Board of Regents Uniform Policy on Sexual Misconduct. (Doc. 193-2 at ¶ 74; Doc. 204-1 at ¶ 74).

### E. Silva Attended LSU in the Fall of 2014 and Attended ULL in the Spring of 2015.

In the fall of 2014, Silva began his first semester at LSU. (Doc. 193-2 at ¶ 98, 204-1 at ¶ 98). At the end of the first semester of the 2014–2015 academic year at LSU, Silva had a 0.75 grade point average and had been placed on scholastic probation. (Doc. 193-2 ¶ 112; Doc. 204-1 ¶ 112).

Silva transferred to ULL in January 2015. (Doc. 193-2 ¶ 115; Doc. 204-1 ¶ 115). At ULL, transfer students must meet the 2.25 GPA requirement "to guarantee

admissions." (Doc. 193-2 ¶ 113; Doc. 204-1 ¶ 113). Otherwise, the transfer student must "apply for admissions by exception," which involves submitting an application for "admissions by exception" that a committee or the Director of Undergraduate Admissions reviews. (Doc. 193-2 ¶¶ 113–14; Doc. 204-1 ¶¶ 113–14). Because Silva had a .75 GPA, ULL admitted him by exception. (Doc. 193-2 ¶ 115; Doc. 204-1 ¶ 115).

### F. While a ULL Student in Spring of 2015, Silva was Arrested on a Charge of Forcible Rape.

On April 1, 2015, Silva, while attending ULL, was arrested on a charge of forcible rape allegedly committed on LSU's campus. (Doc. 193-2 ¶ 118; Doc. 204-1 ¶ 118). That same day, ULL Police Department Lieutenant Michael Louviere informed ULL Associate Dean of Students and Interim Director of Student Life and Conduct Tapo of Silva's arrest. (Doc. 193-2 ¶ 127; Doc. 204 ¶ 127; Doc. 193-27). Louviere's email to Tapo stated:

From: Michael J Louviere <mil8925@louisiana.edu>
Date: April 1, 2015 at 4:58:03 PM CDT
To: "Carl E Tapo, Sr." <tapo@louisiana.edu>
Subject: arrest of Victor Silva

Dean Tapo:

In reference to the subject we spoke about in my office on 04/01/2015, Mr. Victor Silva, ██████ was arrested on an active fugitive warrant issued by LSU Police Department on 03/28/2015, for the charge of Forcible Rape. This incident was said to have occurred on the LSU Campus on 03/28/2015. Mr. Silva was contacted by cellular phone and asked to meet with me regarding an investigation. Once arrived, he was advised he had an active warrant for his arrest and was told of his charges. Mr. Silva was questioned by detectives with LSU PD and later transported to LPCC for further booking procedures.

"See Something, Say Something"

Lt. Michael Louviere
UL Lafayette Police Department
Investigations Division
(337) 482-5936
(337) 482-6451 fax

(Doc. 193-2 ¶ 127; Doc. 204 ¶ 127; Doc. 193-27).

Although Tapo received notice that Silva had been arrested for the charge of forcible rape, Tapo did not recall requesting an incident report from the ULL Police Department regarding Silva, or any other student for that matter. (Doc. 193-5 at 101:25–102:6). Tapo did not request that the ULL Police Department keep him informed if Silva was involved in any other potentially criminal matters. (*Id.* at 102:8–16). Tapo testified that "[i]t's not a request I would have made." (*Id.* at 102:13).

On April 8 or 9, 2015, Tapo received an email from LSU Associate Dean Matthew Gregory, entitled "V. Silva," which stated:

**From:** Matt Gregory [mailto:mgregory@lsu.edu]
**Sent:** Wednesday, April 08, 2015 2:43 PM
**To:** tapo@louisiana.edu
**Subject:** V. Silva

Carl,

I hope this email finds you well. Sorry to be reaching out for a negative reason. We at LSU wanted to make sure you were aware of the following information about a former LSU student who appears to now be a UL student.

http://theadvocate.com/news/police/12007328-123/ul-lafayette-student-accused-in

Thank you,
Matt

D. Matthew Gregory, Ph.D.
Associate Dean of Students and
Director, Student Advocacy and Accountability
Louisiana State University
340 LSU Student Union
Baton Rouge, LA 70803
ph-225-578-4307
mgregory@lsu.edu



www.LSU.edu/gold

(Doc. 193-2 ¶ 128; Doc. 204 ¶ 128; Doc. 193-29; Doc. 198-9; Doc. 198-10).

A search for the still-publicly available Advocate article regarding this event shows an April 4, 2015, article titled *UL Lafayette student accused in the rape of a*

*woman in LSU dorm over the weekend*. An excerpt is shown below, and the full article is available at the link cited herein.



## UL Lafayette student accused in the rape of a woman in LSU dorm over the weekend

BY Matt McKinney mmckinney@theadvocate.com   Apr 4, 2015   📖 1 min to read

f  𝕏  ✉  🖨  📋

LSU police arrested a Lafayette man Wednesday in the rape of a woman in her dorm room over the weekend.

Victor Silva, 19, was booked into East Baton Rouge Parish Prison on one count of forcible rape.

Matt McKinney, *UL Lafayette student accused in the rape of a woman in LSU dorm over the weekend*, THE ADVOCATE (Apr. 4, 2015), https://www.theadvocate.com/baton_rouge/news/crime_police/ul-lafayette-student-accused-in-the-rape-of-a-woman-in-lsu-dorm-over-the/article_5f87b76e-8d36-57ea-9a52-038063f8d0f0.html.

On April 9, 2015, Tapo responded to Gregory:

**From:** Carl E Tapo, Sr. [mailto:tapo@louisiana.edu]
**Sent:** Thursday, April 09, 2015 8:45 AM
**To:** Matt Gregory
**Subject:** RE: V. Silva

Hi Matt,

All is well on this end and wishing you the same. Thanks for reaching out to us. This is definitely something we would want to be made aware of and address with this student. Coincidently the accused was questioned here by your officers before being arrested and subsequently transported to Baton Rouge. I was called to the station but the interrogation was so long that I never got to see the student prior to his arrest. I will however, be awaiting his release in order to address this situation and his status here. Thanks for making certain that we were aware of issues such as this as I always welcome the relationship.

Thanks Again,

*Carl E. Tapo, Sr.*
Carl E. Tapo, Sr.
Interim Director, Office of Student Life and Conduct
University of Louisiana at Lafayette
Buchanan Hall – First Floor
P.O. Box 43970
Lafayette, LA 70504
Office: 337-482-6378
Fax: 337-482-1167
tapo@louisiana.edu

(Doc. 193-2 ¶ 130; Doc. 204 ¶ 130; Doc. 198-10). Tapo did not ask Gregory or LSU for more information regarding Silva. (Doc. 193-2 ¶ 134; Doc. 204 ¶ 134; Doc. 193-5 at 68:14–22).

Even though Silva was no longer an LSU student, on April 8, 2015, LSU sent a letter to Silva:

> Due to the **potential threat your behavior may pose to the LSU campus community**, you are being placed on interim suspension

18

> immediately under section 11.2 F Interim Suspension, of the LSU Student Code of Conduct. **You are not to attend classes, campus activities, or appear on University property unless officially instructed to do so by the Dean of Students or myself**. Failure to adhere to this directive may result in additional action from Student Advocacy & Accountability and/or LSU Police.

(Doc. 193-2 ¶ 124; Doc. 204 ¶ 124 (emphasis added)). Because of the threat Silva posed to LSU and because of a subsequent report, Silva was informed that he could have been arrested if he returned to LSU's campus. (Doc. 193-2 ¶ 126; Doc. 204 ¶ 126).

### G. ULL placed Silva on Disciplinary Probation from June 2015 to June 2017.

ULL took no action regarding Silva for nearly three months. On June 24, 2015, based on his arrest for the charge of forcible rape, Silva entered into a Letter of Agreement with ULL via Tapo. (Doc. 193-33). The Letter of Agreement found that Silva violated the following subsections of the Code of Student Conduct:

> (15.3) The University expects all students to obey the law, to show respect for properly constituted authority. . .

> (15.5) Physical abuse or threat thereof against any person or persons or other conduct which threatens or endangers the health or safety of any such person or persons.

> (15.22b) Indecent or lewd conduct, perversions or illicit sexual relations.

The Letter of Agreement placed Silva on disciplinary probation until June 24, 2017, and required Silva to attend behavior management sessions with the Office of Counseling and Testing. (Doc. 193-33). The Letter of Agreement stated: "[F]ailure to comply with this Letter of Agreement will result in further disciplinary actions." (Doc. 193-33).

Tapo did not take any measures to ensure that he would be informed if Silva violated the Code again. (Doc. 193-5 at 83:19–84:1). Tapo did not recall asking anyone at ULL to supervise or monitor Silva's on-campus conduct. (*Id.* at 84:3–9). Tapo does not recall asking anyone with the ULL Police Department to monitor Silva or to let Tapo know if they became aware that he engaged in misconduct. (*Id.* at 84:11–17). Tapo did not ask the Lafayette Police Department to inform him if there were other criminal reports regarding Silva. (*Id.* at 84:19–85:4). Tapo did not recall doing "anything proactive" to determine if Silva was engaging in or had engaged in any other misconduct. (*Id.* at 85:20–86:1).

Tapo does not know whether Silva attended more than one session with the Office of Counseling and Testing, nor did Tapo make an effort to inquire as to whether Silva had completed more than one session. (*Id.* at 88:8–22). Tapo testified that he could not recall having taken any other steps to protect the ULL community from Silva, apart from placing Silva on disciplinary probation.[5] (*Id.* at 92:10–18).

---

[5] Plaintiff filed police reports into the record showing the following: Before Silva transferred to ULL, on October 6, 2014, the Lafayette Police Department recorded a report of "third degree rape (vagina)" involving suspect Silva. (Doc. 193-21). Police collected a Sexual Assault Kit and booked it into evidence at the Lafayette Police Department. (*Id.*).

While Silva was on disciplinary probation at ULL: (1) Silva admitted to receiving nude photos from a minor (Report dated September 16, 2015); and (2) a claimant reported that Silva sent her a video text depicting claimant and Silva having sex, the video was taken without claimant's knowledge, and Silva informed claimant that he would delete the video in exchange for pictures of the claimant (Report dated November 16, 2016). (Doc. 193-36; Doc. 193-37). Tapo did not recall being made aware of these instances. (Doc. 193-5 at 113:21–127:16 (Q. "And now, this was in 2015 – in September of 2015. And during this time, Mr. Silva was on disciplinary probation at UL Lafayette, correct?" A. "Correct." [. . .] Q. "Now as of November 16, 2016, Silva was still on disciplinary probation at UL Lafayette, correct?" A. "Correct.")).

In April 2018, before Silva transferred from ULL to Tech, ULL Police Department Lieutenant Michelle Broussard notified Perez and Tapo via email that Silva had been arrested over the weekend for a "failure to appear arrest warrant," issued in October 2016, while Silva was on disciplinary probation.[6] (Doc. 193-41). Tapo agreed that it was a "rare occurrence" for a ULL student who was previously arrested for forcible rape to be arrested for a second time. (Doc. 193-5 at 111:8–112:5). Tapo also agreed that this is a situation that would have warranted action with respect to Silva, had he known about it, but Tapo testified that he did not see Broussard's email. (Doc. 193-5 at 112:7–113:1).

### H. After Silva's Probation at ULL Ended in June 2017, Silva Transferred to Tech for the Fall 2018 Semester.

After Siva's term of disciplinary probation ended in June 2017, Silva applied to transfer to Tech for the Fall 2018 semester and was accepted. (Doc. 198-2 at ¶ 10; Doc. 210-1 at ¶ 10). Even if a disciplinary hold had been placed on Silva's account, he

---

After Silva's period of disciplinary probation ended, but before he transferred to Tech, police reports show the following: On December 10, 2017, ULL Police Department responded to a report of "disturbing the peace" incident in a dorm room, with Silva and a female student inside the dorm room. (Doc. 193-39). On April 26, 2018, another claimant reported to the Lafayette Police Department that during intercourse with Silva, she told him to stop, and he did not. (Doc. 193-40) On April 28, 2018, ULL Police arrested Silva on the second floor of the Dupre Library on ULL's campus. (Doc. 193-42). On August 3, 2018, another claimant informed the Lafayette Police Department that Silva raped her when they were both 14 years of age. (Doc. 193-43).

ULS asks the Court to ignore the ULL Police Department and Lafayette Police Department reports for lack of authentication. The Court agrees that the reports are currently unauthenticated, but notes that these reports will likely be subject to admission at trial under Federal Rule of Evidence 803. The Court will not consider the reports on summary judgment.

[6] Although ULS argues that the Court should strike this email as unauthenticated, ULS itself produced this document during discovery. (Doc. 216 at 7).

still would have been permitted to obtain his transcript in order to transfer. (Doc. 198-2 at ¶ 11; Doc. 210-1 at ¶ 11).

## I. Silva Allegedly Raped Plaintiff in September 2018.

During the first full month of the Fall 2018 semester at Tech, Silva allegedly raped Plaintiff. Silva and Plaintiff met on Tinder, a dating app, around September 16, 2018. (Doc. 198-2 at ¶ 15; Doc. 210-1 at ¶ 15). Plaintiff and Silva studied together twice on campus. (Doc. 198-2 at ¶ 16; Doc. 210-1 at ¶ 16). Silva invited Plaintiff to his off-campus apartment on September 18, 2018, and Plaintiff accepted the invitation. (Doc. 198-2 at ¶ 17; Doc. 210-1 at ¶ 17). On the night of September 18, 2018, Plaintiff drove herself to the address Silva gave her as his apartment. (Doc. 198-2 at ¶ 18; Doc. 210-1 at ¶ 18). Silva allegedly raped Plaintiff on the morning of September 19, 2018, at Silva's off-campus apartment. (Doc. 193-2 at ¶ 17, 204-1 at ¶ 17).

Plaintiff saw a sorority post on December 11, 2018, in a group text that identified Silva as a serial rapist and warned women to stay away from him. (Doc. 198-2 at ¶ 25; Doc. 210-1 at ¶ 25). Silva's name, his purported history with other women, and that he had been a student at ULL was "on the internet" around this time. (*Id.*). The sorority post stated that Silva transferred from ULL and enrolled at Tech in the Fall; that "[a]cording to people from UL" he had sexually assaulted/raped 16 known victims as of "last year"; that he had sexually assaulted "at least" two girls at Tech; and that he "goes by" the name "Daniel Silva". (Doc. 198-2 at ¶ 26; Doc. 210-1 at ¶ 26).

Plaintiff spoke with more people about Silva by December 12, 2018, and learned that Silva had allegedly committed similar acts at other schools, including ULL and LSU; that information about Silva was shared across multiple group messages; and that he had been banned from Tech sorority functions. (Doc. 198-2 at ¶ 27; Doc. 210-1 at ¶ 27). Plaintiff knew in December 2018 that several students on multiple university campuses (including ULL and LSU) claimed that Silva assaulted them. (Doc. 198-2 at ¶ 28; Doc. 210-1 at ¶ 28).

### J.  Plaintiff Reported Silva's Rape to Tech, Tech PD, and Ruston PD in December 2018.

Plaintiff reported Silva's rape to Tech, Tech PD, and Ruston PD on Friday afternoon, December 14, 2018. (Doc. 198-2 at ¶ 29; Doc. 210-1 at ¶ 29). On December 17, 2018, Silva resigned from Tech. (Doc. 198-2 at ¶ 31; Doc. 210-1 at ¶ 31). Also on December 17, 2018, Tech met with Plaintiff and informed her that Silva resigned from Tech before Tech could meet with him to discuss the allegations made about him and before Tech could launch an investigation. (Doc. 198-2 at ¶ 32; Doc. 210-1 at ¶ 32).

Plaintiff reported to Flournoy, Tech Title IX coordinator, that Silva raped her. Flournoy determined that because the rape occurred off-campus, Title IX did not apply. (Doc. 204-7 at 124:6–12). Flournoy inaccurately determined that Title IX did not apply "solely on the basis that the rape occurred off campus." (Doc. 204-7 at 124:13–16).

23

### K. ULS Permitted Silva to Re-Enroll at ULL in January 2019, Immediately After Resigning from Tech in December 2018.

Although Tech told Plaintiff there was nothing it could do regarding her report of Silva's rape because Silva had resigned from Tech, Tech released Silva's transcript to ULL on January 14, 2019, one month after Plaintiff's December 14, 2018 report of Silva's rape. (Doc. 193-65).[7] Tech also released Silva's transcript to Silva on January 11, 2019, and to Beaumont on April 30, 2019. (*Id.*). The Tech Registrar records reflect that Tech released Silva's transcript three times between January 11 and April 30, 2019, despite knowing that Plaintiff reported Silva for rape, and despite the fact that Act 172 required "institutions [to] withhold transcripts of students seeking a transfer with pending disciplinary action relative to sexually-oriented criminal offenses, until such investigation and adjudication is complete." (Doc. 193-2 at ¶ 44; Doc. 204-1 at ¶ 44). The Tech Registrar record relevant to the release of Silva's transcript is shown below:

---

[7] ULS argues that the Court should disregard the May 26, 2021 email between Tech administrators located at Doc. 193-65 as unauthenticated. ULS ignores the fact that ULS itself produced this email during discovery, and that Crawford testified that he was familiar with the document and that he wrote the email shown in the document. (Doc. 193-11 at 137:13–139:25). The Court will not ignore the email based on a purported lack of authentication.

```
Copies Hld   Dates   TID Adr Sent To
Ch/Fr Ovr  Rq/Sb/Pt Trm Sel

      1      04-30-19 2828 P   OFFICE OF ADMISSIONS
             04-30-19 X179     BEAUMONT                  TX US
             04-30-19 20192
      1      01-14-19 2828 P   OFFICE OF ADMISSIONS
             01-14-19 X018     LAFAYETTE                 LA US
             01-14-19 20192
      1   Y  01-11-19 1110 P   issued to student
             01-11-19 LX59                               US
             01-11-19 20192
```

Joshua Chovanec
University Registrar
Louisiana Tech University Registrar's Office
P.O. Box #3155
207 Keeny Hall
Ruston, LA 71272
318-257-2176

Based on Tech's release of Plaintiff's transcript, Silva was permitted to re-enroll at ULL in January 2019. (Doc. 198-2 at ¶ 35; Doc. 210-1 at ¶ 35). Silva ultimately graduated from ULL without issue. (Doc. 193-2 at ¶ 370(i); Doc. 204-1 at ¶ 370(i)).

### L.  Plaintiff Graduated from Tech With Honors.

Plaintiff graduated with honors from Tech in May 2020. (Doc. 198-2 at ¶ 37; Doc. 210-1 at ¶ 37).

**M. Kenny Jacoby's *USA Today* Article.**

On May 26, 2021, *USA Today* published an article written by Kenny Jacoby titled "Six women reported a Louisiana college student for sexual misconduct. No one connected the dots." (Doc. 193-2 at ¶ 40, 204-1 at ¶ 40).

Plaintiff spoke with Kenny Jacoby via telephone four times total, on the following dates: (1) December 10, 2020; (2) February 9, 2021; (3) April 22, 2021; and (4) May 25, 2021. (Doc. 193-2 at ¶ 27, 204-1 at ¶ 27). Plaintiff and Jacoby also exchanged text messages. Among others, these text messages included Plaintiff forwarding webpage links regarding articles of other students at Louisiana Tech that reported on the school's alleged minimization of sexual assault cases on campus, Plaintiff's acknowledgment of her awareness that Jacoby's focus was at LSU, and Plaintiff providing Jacoby with information about other women who may have been sexually assaulted by Silva at Tech. (Doc. 193-2 at ¶ 28, 204-1 at ¶ 28).

**N. On May 26, 2021, In Response to Jacoby's *USA Today* Article, Tech Admits It Should Have Placed a Hold on Silva's Transcript.**

In response to Jacoby's *USA Today* article, Tech administrators emailed amongst themselves. (Doc. 193-65). Tech Assistant Vice President for Student Advancement Crawford admitted that Tech should have placed a hold on Silva's transcript. (*Id.*). On May 26, 2021, in response to Jacoby's *USA Today* article, Tech placed a hold on Silva's transcript. (*Id.*; *see also* Doc. 234-1 (including ULS's admission that "[w]hen Tech personnel read the article, the email string ensued, and the personnel decided in May 2021 to place a hold on Silva's transcript.")). Portions of the May 26, 2021 email among Tech administrators are shown below:

26

On May 26, 2021, at 8:55 AM, Carrie Flournoy
<flournoy@latech.edu> wrote:

Josh,

Keri King told me that we do not have a HOLD on
Victor Silva's transcript, only a HOLD for registration.
Is this correct? Aren't we supposed to have a HOLD
on the transcript as well?

Thanks!

Carrie M. Flournoy
Louisiana Tech University
Executive Assistant to the President,
  Title IX & Compliance Coordinator
Office of the President
P.O. Box 3168
Ruston, LA 71272
Phone (318) 257-3785

27

**From:** Dickie Crawford <crawford@latech.edu>
**Sent:** Wednesday, May 26, 2021 9:13 AM
**To:** Carrie Flournoy <flournoy@latech.edu>
**Cc:** Josh Chovanec <joshuac@latech.edu>; Adam Collins
<acollins@latech.edu>; Sam Speed <sspeed@latech.edu>
**Subject:** Re: Transcript Hold

Yes, we are supposed to have a hold on the transcript. However,
he already has the transcript from the one fall quarter that he
attended Tech. He used that to transfer back to ULL and
graduate.


Dickie Crawford, Ed.D.
Associate Vice President for Student Advancement
Louisiana Tech University
Keeny Hall #305
P.O. Box 3164
Ruston, Louisiana 71270
Phone: 318-257-2445
Fax: 318-257-2961
crawford@latech.edu

(Doc. 193-65).

## II.    PROCEDURAL HISTORY

Plaintiff filed suit on May 25, 2022. (Doc. 1). Plaintiff asserts the following

three claims against ULS: (1) heightened risk claim in violation of Title IX,

20 U.S.C. § 1681, *et seq.* (Count I); (2) post-report claim in violation of Title IX,

20 U.S.C. § 1681, *et seq.* (Count I); and (3) negligence under Louisiana state law

(Count II). (*Id.* at ¶¶ 134–155).

In Count I, Plaintiff's pre-assault or "heightened-risk" claim alleges that before

her assault, ULS's deliberate indifference to actual notice of the threat posed by

Silva—manifested by ULS's failures to investigate or meaningfully discipline Silva

28

after he was arrested for rape and to prevent Silva from transferring to Tech—substantially increased her risk of being sexually assaulted by Silva. (*Id.* at ¶¶ 134–143).

Plaintiff's "post-report claim" alleges that ULS's deliberately indifferent response to her own report of Silva's September 2018 assault—manifested by ULS's failures to investigate or discipline Silva even after he returned to ULL—deprived her of educational opportunities provided by Tech. (*Id.* at ¶¶ 144–149).

Plaintiff's negligence claim under state law alleges that ULS was negligent by:

a. Failing to protect Ms. Doe from Silva;

b. Failing to take meaningful measures to prevent Silva from sexually assaulting female students;

c. Failing to investigate Student 2's report that Silva raped her, including but not limited to [*sic.*] by requesting additional information from LSU concerning Silva's sexual misconduct and any disciplinary actions taken against him, and failing to request additional information from Baton Rouge law enforcement [officials] or Student 2;

d. Failing to investigate Silva in connection with the report that he raped Student 2 or to make a determination whether he was responsible for engaging in sexual harassment and/or violation of the student code of conduct;

e. Failing to inform the Lafayette PD and District Attorney's Office that Silva was on disciplinary probation and the importance of reporting to the school when any other complaints were made concerning his alleged criminal sexual misconduct;

f. Failing to ascertain whether any female students reported Silva to Lafayette PD for sexual misconduct;

29

g. Permitting Silva to transfer to Tech, with a clean record and no notification to Tech Title IX staff or other administrators of his prior arrest for second degree rape or disciplinary probation at UL Lafayette;

h. Refusing to conduct a Title IX, or any other, investigation of the report that Silva had raped Ms. Doe;

i. Permitting Silva to transfer out of Tech and back to UL Lafayette, [] to avoid an investigation and disciplinary consequences for his reported rape of Ms. Doe;

j. Refusing to withhold Silva's transcript, as required by Act 172 and the school's own policy;

k. Refusing to investigate Silva even though he remained under Defendant Board of Supervisors' control as a student at UL Lafayette;

l. Failing to inform Ms. Doe that Silva had transferred back to UL Lafayette, and that she could file a Title IX complaint against him at that school;

m. Failing to provide adequate Title IX and/or Act 172 training and education to administrators on investigating and responding to reports of student sexual harassment; and

n. Failing to comply with the Executive Order, Act 172, Uniform Policy, and/or its own sexual harassment policy, all of which were intended to protect students like Ms. Doe from sexual assault.

(*Id.* at ¶ 152).

On October 3, 2022, ULS moved to dismiss, arguing, among other things, that Plaintiff's claims were time-barred and that ULS is immune from liability. (Doc. 40). The Court denied ULS's Motion. (Doc. 52).

Relevant to the instant Motion, the Court found that none of Plaintiff's claims against ULS were time-barred. First, the Court found that "Plaintiff's heightened

risk claim plausibly accrued in May 2021, less than one year prior to pursuing this action." *Doe v. Bd. of Supervisors of Univ. of La. Sys.*, 650 F. Supp. 3d 452, 475 (M.D. La. 2023). Second, the Court found that "even if Plaintiff's post-assault claim accrued before she read the USA Today article, it was nonetheless plausibly tolled by Louisiana's third category of *contra non valent[e]m* (fraud) because ULS took affirmative action to prevent Plaintiff from pursuing her rights." *Id.* at 476. Third, the Court found that "even if Plaintiff's negligence action accrued more than one year before she filed suit, she has plausibly alleged facts establishing that prescription was tolled by *contra non valent[e]m* until she read the USA Today article in May 2021." *Id.* at 477–78. The Court also found that ULS was not entitled to immunity under Act 172. *Id.* at 478.

Now, ULS moves for summary judgment, asking the Court to dismiss each of Plaintiff's claims against it. (Doc. 198). Plaintiff also moves for partial summary judgment, asking the Court to find that ULS had actual knowledge for purposes of Plaintiff's heightened risk and post-report claims. (Doc. 193). For the following reasons, ULS's Motion is **DENIED** and Plaintiff's Motion is **GRANTED.**

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure ("Rule") 56(a) provides that the Court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> In considering a motion for summary judgment, the district court must
> view the evidence through the prism of the substantive evidentiary

31

> burden. All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. If the record, viewed in this light, could not lead a rational trier of fact to find for the nonmovant, summary judgment is proper. On the other hand, if the factfinder could reasonably find in the nonmovant's favor, then summary judgment is improper.
>
> Finally, even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that a better course would be to proceed to a full trial.

*Kunin v. Feofanov*, 69 F.3d 59, 61–62 (5th Cir. 1995) (quotation marks, alterations, and citations omitted); *see also Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 538 (5th Cir. 2012) (same); *accord Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994) ("The Supreme Court has recognized that, even in the absence of a factual dispute, a district court has the power to 'deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Importantly, when conducting the summary judgment analysis, the Court is prohibited from evaluating the credibility of the witnesses, weighing the evidence, or resolving factual disputes. *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021). Put differently, the Court may *not* credit certain witness testimony over other evidence: "By choosing which testimony to credit and which to discard, a court improperly weighs the evidence and resolves disputed issues in favor of the moving party. Doing so is tantamount to making a credibility determination, and—at this summary judgment stage—a court may make no credibility determinations." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 245 (5th Cir. 2016) (quotation marks, alterations, and citations omitted).

## IV.   ANALYSIS

ULS asks the Court to issue summary judgment in its favor on each of Plaintiff's claims against it: (1) heightened risk claim under Title IX (Count I); (2) post-report claim under Title IX (Count I); and (3) negligence claim under Louisiana state law (Count II).  (Doc. 1 at ¶¶ 134–155).

First, ULS argues that summary judgment is warranted in its favor on Plaintiff's heightened risk claim because: (1) the Court does not recognize this legal theory; and (2) the claim is not supported by the law and evidence.

Second, ULS argues that summary judgment is warranted in its favor on Plaintiff's post-report claim because: (1) the claim is time-barred; and (2) the claim is not supported by the law and evidence.

Finally, ULS argues that summary judgment is warranted in its favor on Plaintiff's negligence claim because: (1) ULS is immune from suit and liability for claims under Louisiana state law; (2) Plaintiff's negligence claims are time-barred; (3) Plaintiff's negligence claim is not supported by the law or evidence; (4) Plaintiff is not entitled to certain damages; and (5) comparative fault of Silva and LSU applies to the state law claims.

Plaintiff also moves for summary judgment, asking the Court to find that ULS had "actual knowledge" for purposes of Plaintiff's Title IX claims. (Doc. 193).

The Court will address each of the party's arguments claim-by-claim.

### A. Plaintiff's Title IX Heightened Risk Claim Against ULS.

First, the Court addresses the viability of Plaintiff's heightened risk claim under precedent set by the United States Court of Appeals for the Fifth Circuit and this Court.

### i. The Court Recognizes Plaintiff's Heightened Risk Claim in this Context.

ULS argues that the Fifth Circuit and this Court do not recognize a Title IX heightened risk claim, relying on *Poloceno v. Dallas Indep. Sch. Dist.*, 826 F. App'x 359 (5th Cir. 2020) and *Doe #1 v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, No. CV 21-564-SDD-SDJ, 2022 WL 16701930, at *15 (M.D. La. Nov. 3, 2022).

In *Poloceno*, the mother of a middle school student filed suit against the school district, alleging that the school's punishment requiring students to perform ceiling jumps for failure to dress properly in physical education class violated Title IX. *Poloceno v. Dallas Indep. Sch. Dist.*, 826 F. App'x at 361. In that context, the Fifth Circuit stated in a non-precedential opinion:

> We have never recognized or adopted a Title IX theory of liability based on a general "heightened risk" of sex discrimination, and we decline to do so. Moreover, the cases from our sister circuits that recognize the "heightened risk" analysis limit this theory of liability ***to contexts in which students committed sexual assault on other students, circumstances not present here.***

*Poloceno v. Dallas Indep. Sch. Dist.*, 826 F. App'x at 363 (emphasis added) (citing *Simpson v. Univ. of Colo. at Boulder*, 500 F.3d 1170 (10th Cir. 2007) (applying this liability theory in a student-student sexual harassment case); *Karasek v. Regents*

*of Univ. of Cal.*, 956 F.3d 1093, 1112 (9th Cir. 2020) (articulating a four-element test for a plaintiff's heightened risk theory in cases of sexual misconduct and sexual harassment). Because student-student sexual assault was not at issue in *Poloceno*, the Circuit did not address it.

In *Doe #1*, this Court relied on *Poloceno* and dismissed the *Doe #1* plaintiff's heightened risk claim in a case involving sexual assault. *Doe #1*, 2022 WL 16701930, at *16 (finding that plaintiffs do not have a viable heightened risk claim). Just 11 days after this Court issued its Ruling in *Doe #1*, however, the Fifth Circuit recognized a heightened risk claim in the context of student-student sexual harassment in *Roe v. Cypress-Fairbanks Independent School District*.[8] 53 F.4th 334, 341–42 (5th Cir. 2022). *Roe* was a precedential opinion, making it more persuasive than *Poloceno*. *See Doe v. Beaumont Indep. Sch. Dist.*, 727 F. Supp. 3d 589, 615 (E.D. Tex. 2024).

Just last week, the Court reconsidered its opinion in *Doe #1* based on intervening case law and recognized the *Doe #1* plaintiff's heightened risk claim:

> In *Roe*, the Fifth Circuit dismissed a heightened risk claim because elements of plaintiff's claim were not met; the court did not dismiss on the grounds that it did not acknowledge a heightened risk claim nor was there reference to *Poloceno*. [. . .] Thus, the Fifth Circuit has not foreclosed these types of claims and there is a legitimate reason for the Court to reconsider its decision to dismiss Plaintiff's heightened risk claims.

---

[8] In *Roe*, the Circuit ultimately determined that plaintiff failed to raise a genuine dispute as to the elements of the claim.

*Jane Doe #1, et al. v. Bd. Of Supervisors of La. State Univ. & Agric. & Mech. Coll., et al.*, No. 21-CV-00564-SDD-SDJ, 2025 WL 1879534, at *10–11 (M.D. La. July 8, 2025) ("The Court finds from the allegations detailed at great length in the Court's previous Ruling, [p]laintiffs have stated a plausible heightened risk claim.").

In *Owens v. La. State Univ.*, this Court relied on the Fifth Circuit's Opinion in *Roe* and found that found that the *Owens* plaintiff's heightened risk claim survived summary judgment. *Owens v. Louisiana State Univ.*, 709 F. Supp. 3d 219, 245 (M.D. La. 2023) ("Thus, the Board of Supervisors is not entitled to summary judgment on the basis that Hovis cannot establish this element of her heightened risk claim."). There, the Court emphasized: "The Court further notes that several district courts in this Circuit, including this one, have recognized a policy-based heightened risk claim." *Id.* at 233 (citing *Doe v. Bd. of Supervisors of Univ. of La. Sys.*, 650 F. Supp. 3d 452, 467 (M.D. La. 2023) ("The recognition of this private right of action has given rise to two general avenues for Title IX claims—one for claims based on an official policy of discrimination and another for claims based on an institution's actual notice of and deliberate indifference to sexual harassment or assault."); *Lozano v. Baylor Univ.*, 408 F. Supp. 3d 861, 882 (W.D. Tex. 2019) ("The Court finds that Lozano has plausibly alleged that Baylor's selective enforcement of reports of domestic abuse and sexual assault created a heightened risk of assault, which subjected her to a sexually discriminatory education environment under Title IX. Lozano's heightened risk claim fits squarely within the official-policy rubric

previously identified by the Supreme Court."); *Gruver v. La. through Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, 401 F. Supp. 3d 742, 762 (M.D. La. 2019) ("The Court finds that, as in *Baylor*, if these facts are proven, a jury may infer that LSU's policy created the heightened risk to Greek male students of serious injury or death by hazing, thereby inflicting the injury alleged herein."); *Doe 1 v. Baylor Univ.*, 240 F. Supp. 3d 646, 661 (W.D. Tex. 2017) ("Plaintiff's heightened-risk claims fit squarely within the official-policy rubric previously identified by the Court, and the Court is satisfied that [p]laintiffs have met their burden under Rule 12(b)(6)."); *Doe 12 v. Baylor Univ.*, 336 F. Supp. 3d 763, 783 (W.D. Tex. 2018) ("These alleged facts, construed as true, 'raise a right to relief above the speculative level' that Baylor's policy or custom of inadequately handling and even discouraging reports of peer sexual assault constituted an official policy of discrimination that created a heightened risk of sexual assault, thereby inflicting the injury of which [p]laintiffs complain.")).

In *Doe v. Beaumont Indep. Sch. Dist.*, the U.S. District Court for the Eastern District of Texas analyzed both *Poloceno* and *Roe* and held that "heightened risk claims are at the very least available in student-student Title IX claims." 727 F. Supp. 3d 589, 615 (E.D. Tex. 2024).

In *Doe v. Texas A&M Univ.*, the U.S. District Court for the Southern District of Texas emphasized that "[w]hile the Fifth Circuit has not recognized as cognizable a Title IX claim for creation of a general heightened risk of discrimination, it has not

foreclosed the possibility that such a claim may be cognizable in the context of student-on-student sexual assault." 634 F. Supp. 3d 365, 375 (S.D. Tex. 2022).

Here, this case involves student-student sexual assault. Plaintiff alleges that ULS had a highly-particularized level of knowledge regarding the risk at issue— namely, the identity of Silva, who had allegedly raped other students, and then proceeded to allegedly rape Plaintiff.[9] The Court will not dismiss Plaintiff's heightened risk claim on this basis alone.

### ii.    Whether Plaintiff Satisfies the Elements of Heightened Risk Claim.

Alternatively, ULS argues that it is still entitled to summary judgment on Plaintiff's heightened risk claim because Plaintiff failed to satisfy the elements of same. Plaintiff filed her own Motion for Partial Summary Judgment, asking the Court to find that ULS had "actual knowledge" or "actual notice" on Plaintiff's heightened risk and post-report claims. (Doc. 193).

To establish her heightened risk claim, Plaintiff must establish the following elements: (1) ULS had actual knowledge of the harassment; (2) the harasser (Silva) was under ULS's control; (3) the harassment was based on the victim's (Plaintiff's)

---

[9] Other courts have dismissed a heightened risk claim for failure to allege that defendant had particularized knowledge. *Doe v. Texas A&M*, 634 F.Supp.3d 365, 377–78 (S.D. Tex. 2022) (dismissing plaintiff's heightened risk claim because "[m]issing from Plaintiffs' Second Amended Complaint are facts capable of showing that TAMU ignored reports of sexual assault or harassment within the Aggie ACHIEVE program, or that before A.T.'s alleged assaults Aggie ACHIEVE students reported sexual assaults, or that TAMU maintained a policy or custom of mishandling such reports."). Here, the opposite is true. Plaintiff alleges that ULS knew that Silva raped other students and still allowed him to attend multiple universities within ULS's control.

sex; (4) the harassment was "so severe, pervasive, and objectively offensive that it effectively barred the victim's access to an educational opportunity or benefit"; and (5) ULS was deliberately indifferent to the harassment. *Doe v. Bd. of Supervisors of Univ. of La. Sys.*, 650 F. Supp. 3d 452, 468 (M.D. La. 2023) (citing *Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 341 (5th Cir. 2022)). ULS contends that Plaintiff cannot satisfy the actual knowledge, control, or deliberate indifference elements. The Court will address each element at issue in turn.

### a. ULS Had Actual Knowledge.

First, the Court finds that ULS had "actual knowledge." The Fifth Circuit has held that actual knowledge "means that the school must have actual, not constructive, knowledge of sexual harassment." *Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 341 (5th Cir. 2022) (citing *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 650 (1999); *K.S. v. Nw. Indep. Sch. Dist.*, 689 F. App'x. 780, 784 (5th Cir. 2017)). "Specifically, the school must have actual knowledge that harassment has occurred, is occurring, or that there is a 'substantial risk that sexual abuse would occur.'" *Roe*, 53 F.4th at 341 (quoting *M.E. v. Alvin Indep. Sch. Dist.*, 840 F. App'x. 773, 775 (5th Cir. 2020) (internal quotation marks omitted)). According to the Fifth Circuit, "liability requires that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Roe*, 53 F.4th at 341 (quoting *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 658 (5th Cir. 1997) (internal citations omitted)).

The Fifth Circuit has also held that for a school to have "actual knowledge" of harassment, an "appropriate person"—"an official [with] authority to address the alleged discrimination and to institute corrective measures"—must have actual knowledge of the discrimination and an opportunity to rectify it. *Doe v. Edgewood Ind. Sch. Dist.*, 964 F.3d 351, 358–59 (5th Cir. 2020) (quoting *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 290 (1998)); *see also Owens v. La. State Univ.*, No. CV 21-242-WBV-SDJ, 2023 WL 8879763, at *6 (M.D. La. Dec. 22, 2023).

ULS argues that ULL did not have "actual knowledge" of the risk at issue before Plaintiff's alleged rape, and as a result, Plaintiff cannot prove her heightened risk claim. (Doc. 198-1 at 20). ULS emphasizes that the "red flags" it received are insufficient to establish actual knowledge. (Doc. 198-1 at 21). ULS argues that in Spring 2015, ULL only knew that Silva had been arrested and that the charges were later dropped.[10] (*Id.*). ULS surprisingly asserts that ULL did not know that Silva sexually assaulted other students. (*Id.*).

Plaintiff responds that ULS ignores the undisputed facts that Tapo was an "appropriate person" for Title IX purposes, and, on April 1, 2015, he was notified by ULL's police force that Silva had been arrested on the charge of forcible rape. (Doc. 210 at 15). Plaintiff also points to the undisputed fact that LSU Associate Dean Gregory emailed Tapo with a news article concerning Silva's arrest for forcible rape, noting that Silva appeared to be a ULL student. (*Id.*).

---

[10] Plaintiff emphasizes that ULS was not informed whether charges against Silva were "dropped"; instead, that is a fact ULS fabricated and is nowhere to be found in the record. (Doc. 210 at 21).

The undisputed evidence before the Court shows that on April 1, 2015, ULL Associate Dean of Students and Interim Director of Student Life and Conduct Tapo was notified that Silva was arrested on the charge of forcible rape allegedly committed on LSU's campus. (Doc. 193-2 ¶ 127; Doc. 204 ¶ 127; Doc. 193-27). ULL Police Department Lieutenant Michael Louviere informed Tapo: "In reference to ***the subject we spoke about in my office on 04/01/2015, Mr. Victor Silva was arrested . . . for the charge of Forcible Rape***." (*Id.* (emphasis added)).

Tapo was the "appropriate person" to receive such notification because he had the authority to address it and take appropriate measures in response. According to Tapo's job description, which Tapo testified accurately reflected his responsibilities, Tapo served at ULL "as the ***chief disciplinary officer*** and direct[ed] overall operations of the student conduct system for undergraduate and graduate students for cases of academic and nonacademic misconduct." (Doc. 193-5 at 26:10–23 (emphasis added)). Moreover, Tapo disciplined Silva, further exhibiting that he was the "appropriate person" to institute corrective measures. (Doc. 193-33).

Then, on April 8 or 9, 2015, Tapo received an email from LSU Associate Dean Matthew Gregory, entitled "V. Silva," stating:

> Carl,
>
> I hope this email finds you well. Sorry to be reaching out for a negative reason. We at LSU wanted to make sure you were aware of the following information about a former LSU student who appears to now be a UL student.
>
> http://theadvocate.com/news/police/12007328-123/ul-lafayette-student-accused-in

(Doc. 193-2 ¶ 128; Doc. 204 ¶ 128). On April 9, 2015, Tapo emailed Gregory:

Hi Matt,

All is well on this end and wishing you the same. Thanks for reaching out to us. This is definitely something we would want to be made aware of and address with this student. Coincidently the accused was questioned here by your officers before being arrested and subsequently transported to Baton Rouge. I was called to the [ULL Police] station but the interrogation was so long that I never got to see the student prior to his arrest. I will however, be waiting his release in order to address this situation and his status here. Thanks for making certain that we were aware of issues such as this as I always welcome the relationship.

(Doc. 193-2 ¶ 130; Doc. 204 ¶ 130).

Tapo even testified that he had actual knowledge that Silva was an alleged serial rapist before Silva raped Plaintiff:

Q. [S]o you understood that Silva was an alleged serial rapist [] in April 2015; is that right?

A. Right.

Q. Okay. And knowing that, were you concerned about the safety of [] young women on UL Lafayette's campus?

A. [. . .] To answer your question, yes. I was concerned, yes.

(Doc. 193-5 at 71:16–72:1).

Based on Silva's arrest for forcible rape, Tapo disciplined Silva for "physical abuse or threat thereof against any person[,]" "conduct which threatens or endangers the health or safety of any such person[,]" "indecent or lewd conduct," and "perversions or illicit sexual relations." (Doc. 193-33). Although ULL placed Silva on

42

disciplinary probation for two years, the probation appears to have had no real consequences.

Based on the same information, on April 8, 2015, LSU sent a letter to Silva, even though he was no longer an LSU student, stating the following:

> Due to the **potential threat your behavior may pose to the LSU campus community**, you are being placed on interim suspension immediately under section 11.2 F Interim Suspension, of the LSU Student Code of Conduct. **You are not to attend classes, campus activities, or appear on University property unless officially instructed to do so by the Dean of Students or myself**. Failure to adhere to this directive may result in additional action from Student Advocacy & Accountability and/or LSU Police.

(Doc. 193-2 ¶ 124; Doc. 204 ¶ 124 (emphasis added)). It is undisputed that Silva could have been arrested if he returned to LSU's campus. (Doc. 193-2 ¶ 126; Doc. 204 ¶ 126).

It is clear from the undisputed facts before the Court that ULS had actual knowledge of the risk Silva posed before Silva allegedly raped Plaintiff. Based on the same knowledge and information, LSU banned Silva from campus and threatened police action. Thus, Plaintiff's Motion for Partial Summary Judgment (Doc. 193) is **GRANTED**.[11]

---

[11] In her Motion for Partial Summary Judgment, Plaintiff asks the Court to find that ULS had "actual knowledge" or "actual notice" for purposes of both of her Title IX claims—heightened risk and post-report. (Doc. 193). The Court addressed Plaintiff's heightened risk claim above. Regarding Plaintiff's post-report claim, ULS admits: "Regarding Plaintiff's post-report deliberate indifference claim, Tech had actual knowledge of one act of alleged sexual harassment." (Doc. 198-1 at 33). Thus, the Court will grant Plaintiff's Motion in its entirety, finding that Plaintiff has satisfied the "actual knowledge" element for purposes of both her heightened risk and post-report claims.

### b. ULS Had Control.

Second, the Court finds that ULS had control. The control element is two-pronged: Plaintiff must show that ULS "'exercises substantial control over both the harasser and the context' in which the harassment occurs." *Hernandez v. Baylor Univ.*, 274 F. Supp. 3d 602, 612 (W.D. Tex. 2017) (Pitman, J.) (quoting *Davis*, 526 U.S. at 645).

ULS argues that Silva was not under ULL's control when he allegedly raped an LSU student. (Doc. 198-1 at 21). Although Silva was a ULL student at the time, ULS contends that "his decision to travel to Baton Rouge for a weekend and any alleged interaction with any LSU student falls outside of ULL'S jurisdiction and control." (*Id.*). Thus, Plaintiff cannot show that ULL exercised substantial control over both the harasser and the context in which the harassment occurred. (*Id.*). Plaintiff responds that a reasonable jury could conclude that ULS had substantial control over Silva.

The United States Supreme Court has found that a defendant "exercise[d] significant control over the harasser" when it had "disciplinary authority over its students." *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 630 (1999). ULS does not dispute that ULL had disciplinary authority over Silva, a ULL student, at the time he was arrested for a forcible rape that allegedly occurred on LSU's campus. Moreover, ULL acknowledged its disciplinary authority by actually disciplining Silva in response to the charge of forcible rape.

44

It is undisputed that based on his arrest for forcible rape, Silva and ULL, through Tapo, entered into a Letter of Agreement. (Doc. 193-33). The Letter of Agreement found that Silva violated several subsections of the Code of Student Conduct and, as a result, placed Silva on disciplinary probation for two years. (*Id.*). The Letter of Agreement emphasized that failure to comply with its terms would result in further disciplinary actions. (*Id.*). Although further disciplinary action would ensue if Silva committed additional violations of the Code, Tapo did not take any other steps to protect the ULL community from Silva. (*Id.* at 92:10–18).

According to Tapo's testimony, he did not take any measures to ensure that he would be informed if Silva violated the Code again. (Doc. 193-5 at 83:19–84:1). Tapo did not recall asking anyone at ULL to supervise or monitor Silva's on-campus conduct. (*Id.* at 84:3–9). Tapo does not recall asking anyone with the ULL Police Department to monitor Silva or to let Tapo know if they saw him engaging in misconduct. (*Id.* at 84:11–17). Tapo did not ask the Lafayette Police Department to inform him if there were other criminal reports regarding Silva. (*Id.* at 84:19–85:4). Tapo did not recall doing "anything proactive" to determine if Silva was engaging in or had engaged in any other misconduct. (*Id.* at 85:20–86:1).

Instead, ULL never held Silva responsible for additional violations committed during his term of disciplinary probation at ULL. Silva left ULL with a clean slate, began attending Tech, and allegedly raped Plaintiff one month after having enrolled at Tech. ULS clearly had control over Silva, but apparently chose not to exercise it in a meaningful way.

### c. Whether ULS Was Deliberately Indifferent is an Issue For the Jury to Decide.

Finally, the issue of whether ULS was deliberately indifferent will be left to the jury. Deliberate indifference, is "a high bar, and neither negligence nor mere unreasonableness is enough." *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 167 (5th Cir. 2011) (citing *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 642, 648 (1999)); *Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 341 (5th Cir. 2022) (same). The deliberate indifference element is met where the school's "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648; *see also Roe*, 53 F.4th at 341 (quoting *Sanches*, 647 F.3d at 167) (same)).

The Fifth Circuit has cautioned that "actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference . . ." *I.F. v. Lewisville Indep. Sch. Dist.*, 915 F.3d 360, 369 (5th Cir. 2019) (quoting *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998)) (internal quotation marks omitted); *Sanches*, 647 F.3d at 168 ("Ineffective responses . . . are not necessarily clearly unreasonable."). Additionally, Fifth Circuit precedent makes clear "that negligent delays, botched investigations of complaints due to the ineptitude of investigators, or responses that most reasonable persons could have improved upon do not equate to deliberate indifference." *I.F.*, 915 F.3d at 369 (citing authority) (internal quotation marks omitted). The Fifth Circuit has held that courts should afford broad deference to school officials and should not second-guess the

46

disciplinary decisions made by school administrators. *Roe*, 53 F.4th at 341 (citing *Davis*, 526 U.S. at 648); *see also Owens v. La. State Univ.*, No. CV 21-242-WBV-SDJ, 2023 WL 8879763, at *12 (M.D. La. Dec. 22, 2023).

ULS argues that ULL was not deliberately indifferent to notice of Silva's arrest. (Doc. 198-1 at 21). Plaintiff responds that a reasonable jury could find that ULS was deliberately indifferent to the substantial risk that Silva would sexually assault students because ULS did not investigate, meaningfully discipline, or monitor Silva, and ULL failed to communicate with the ULL Police Department regarding Silva. (Doc. 210 at 24–28). Based on the lengthy facts in the record showing ULL's inaction in the face of clear facts showing that ULL knew that Silva had been charged with forcible rape, the Court agrees that a reasonable jury could find that ULS was deliberately indifferent for the purpose of Plaintiff's heightened risk claim. ULS's Motion for Summary Judgment (Doc. 198) regarding Plaintiff's heightened risk claim is **DENIED**.

## B. Plaintiff's Post-Report Claim Against ULS.

ULS argues that Plaintiff's post-report claim is time-barred and unsupported by the law and evidence.

### i. Whether Plaintiff's Post-Report Claim Against ULS is Time-Barred.

Title IX does not set forth a limitations period. "When a federal statute does not contain a limitations period . . . the settled practice is to borrow an 'appropriate' statute of limitations from state law." *King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 758 (5th Cir. 2015). The Fifth Circuit instructs that a Title IX action is

47

subject to Louisiana's one-year prescriptive period for personal injury actions, Louisiana Civil Code article 3492.

"Absent tolling, the limitations period runs from the moment a plaintiff's claim 'accrues,' and while we borrow the limitations period from state law, the particular accrual date of a federal cause of action is a matter of federal law." *King-White*, 803 F.3d at 762 (quotation marks omitted). "Under federal law, a claim accrues and the limitations period begins to run the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured." *Id.* (quotation marks omitted). "A plaintiff's awareness encompasses two elements: (1) the existence of the injury; and (2) causation, that is, the connection between the injury and the defendant's actions." *Id.* (quotation marks and alterations omitted).

Even when a Title IX claim has accrued and would otherwise be time-barred, "[e]quitable doctrines may toll the statute of limitations. When a federal cause of action borrows a state statute of limitations, coordinate tolling rules apply." *Lozano*, 408 F. Supp. 3d at 899.

In ruling on ULS's Motion to Dismiss, the Court addressed the same argument and found:

> In cases such as this—alleging pre-*and* post-assault Title IX claims—courts often find that the post-assault claim accrued *before* the pre-assault claim. *See Snyder-Hill*, 48 F.4th at 704. This result follows from the nature of the underlying claims, and the distinction between the (in)action that is being challenged:
>
>> A plaintiff will typically know or have reason to know that a school mishandles their own report of an assault close to the time of the school's inadequate response. But that same plaintiff may

> have no reason to know of a school's deliberate indifference that
> gave rise to their heightened-risk claim. It would be unreasonable
> to conclude that a plaintiff's knowledge that their *individual*
> complaint was mishandled would reveal that the University has
> a broad de facto policy of deliberate indifference generally.

*Id.* (quotation marks omitted). The Court does not question this logic in
the cases where it has been applied. *E.g., Hernandez*, 274 F. Supp. 3d at
617; *Doe 1*, 240 F. Supp. 3d at 663. But those cases are distinguishable
from the facts alleged here.

First, Plaintiff alleges that Silva withdrew from Tech
immediately after she reported her rape to Tech administration. (Doc. 1
at ¶ 117). As a result of Silva's withdrawal, Plaintiff was *not* confronted
with Silva's ongoing presence on campus and, by extension, was
plausibly unaware of Tech's failure to fulfill its duties under Title IX.
Additionally, Plaintiff alleges that she learned only upon reading the
USA Today article that ULS never investigated or disciplined Silva in
connection with Plaintiff's report, *and* that ULS permitted Silva to
transfer back to UL Lafayette without any consequence despite having
just been reported for rape. Thus, plausibly, Plaintiff only discovered
ULS's mishandling of her report on May 26, 2021. *Cf. Hernandez*, 274 F.
Supp. 3d at 617 (plaintiff's post-assault claim was time-barred because,
upon reporting her assault to university officials, plaintiff "knew of her
. . . continuing vulnerability to [her attacker's] presence on campus,"
"knew that Baylor had failed to intervene," and knew "the university
had actual knowledge of her assault and her continuing vulnerability to
[her attacker]").

Second, Plaintiff alleges that just days after reporting her assault,
Tech officials informed her that due to Silva's withdrawal "they would
not investigate him or [Plaintiff's] report." At the same time, Tech
promised Plaintiff that "if Silva reenrolled at Tech, they would call her
back to get her testimony." (Doc. 1 at ¶ 117). Instead, ULS "permitted
Silva to [immediately] transfer back to UL Lafayette." (*Id.* at ¶ 118).
Thereafter, despite Tech's express assurances, ULS did not "investigate
[Plaintiff's] report or Silva," and failed even to inform Plaintiff that she
could file a Title IX complaint against Silva at UL Lafayette.
(*Id.* at ¶ 119).

The sum of these allegations establishes a plausible basis to
conclude that ULS (through Tech) affirmatively misrepresented its
intent to investigate Silva, effectively hiding Silva's reenrollment, and

> preventing Plaintiff from pursuing her post-assault claim. Thus, even if
> Plaintiff's post-assault claim *accrued* before she read the USA Today
> article, it was nonetheless plausibly tolled by Louisiana's third category
> of *contra non valent[e]m* (fraud) because ULS took affirmative action to
> prevent Plaintiff from pursuing her rights. *See Lomont*,
> 172 So. 3d at 637. Again, ULS has not conclusively established that
> Plaintiff's post-assault claim is time-barred. *Abdul-Alim Amin*,
> 706 F.2d at 640; *Petrobras*, 9 F.4th at 256.

*Doe v. Bd. of Supervisors of Univ. of Louisiana Sys.*, 650 F. Supp. 3d 452, 475–76

(M.D. La. 2023). In light of the framework already set forth by the Court, the question

here is whether ULS has conclusively established that Plaintiff's post-report claim is

time-barred. For the reasons below, the Court finds that it has not.

The undisputed evidence shows that Silva allegedly raped Plaintiff on the

morning of September 19, 2018. (Doc. 193-2 at ¶ 17, 204-1 at ¶ 17). Plaintiff saw a

sorority post on December 11, 2018, in a group text that identified Silva as a serial

rapist and warned women to stay away from him. (Doc. 198-2 at ¶ 25; Doc. 210-1

at ¶ 25). Silva's name, his alleged history with other women, and that he had been a

student at ULL was "on the internet" around this time. (*Id.*). The sorority post stated

that Silva transferred from ULL and enrolled at Tech in the Fall; that "[a]cording to

people from UL" he had sexually assaulted/raped 16 known victims as of "last year";

that he had sexually assaulted "at least" two girls at Tech; and that he "goes by" the

name "Daniel Silva". (Doc. 198-2 at ¶ 26; Doc. 210-1 at ¶ 26).

Plaintiff spoke with more people about Silva by December 12, 2018, and

learned: Silva had allegedly committed similar acts at other schools, including ULL

and LSU; information about Silva was shared across multiple group messages; and

he had been banned from Tech sorority functions. (Doc. 198-2 at ¶ 27; Doc. 210-1

at ¶ 27). Plaintiff knew in December 2018 that multiple people on multiple university campuses, including ULL and LSU, claimed that Silva assaulted them. (Doc. 198-2 at ¶ 28; Doc. 210-1 at ¶ 28).

Plaintiff reported Silva's rape to Tech, Tech PD, and Ruston PD on December 14, 2018. (Doc. 198-2 at ¶ 29; Doc. 210-1 at ¶ 29). On December 17, 2018, Silva resigned from Tech. (Doc. 198-2 at ¶ 31; Doc. 210-1 at ¶ 31). Also on December 17, 2018, Tech met with Plaintiff and informed her that Silva resigned from Tech before Tech could meet with him to discuss the allegations made about him and before Tech could launch an investigation. (Doc. 198-2 at ¶ 32; Doc. 210-1 at ¶ 32). Crawford told Plaintiff during the meeting that there was nothing Tech could do about her report since Silva was no longer a Tech student. (Doc. 198-2 at ¶ 101; Doc. 210-1 at ¶ 101).

What Tech failed to inform Plaintiff was that Silva was permitted to re-enroll at ULL without issue the very next month. Although Tech told Plaintiff there was nothing it could do regarding her report of Silva's rape because Silva had resigned from Tech, Tech released Silva's transcript to ULL on January 14, 2019, one month after Plaintiff's December 14, 2018 report of Silva's rape. (Doc. 193-65). Based on Tech's release of Plaintiff's transcript, Silva was permitted to re-enroll at ULL in January 2019. (Doc. 198-2 at ¶ 35; Doc. 210-1 at ¶ 35). Silva ultimately graduated from ULL without issue. (Doc. 193-2 at ¶ 370(i); Doc. 204-1 at ¶ 370(i)).

Tech did not place a hold on Silva's transcript until May 26, 2021, the day Tech administrators read Jacoby's *USA Today* article. (Doc. 193-65; Doc. 234-1 (including

ULS's admission that "[w]hen Tech personnel read the article, the email string ensued, and the personnel decided in May 2021 to place a hold on Silva's transcript.")).

Although Plaintiff presumably knew that Tech did not meaningfully investigate her claim in 2018, she believed, based on what Tech administrators told her, that Silva had resigned from Tech and that there was nothing Tech could do because Silva was beyond ULS's disciplinary authority. Tech also told Plaintiff that if Silva re-enrolled at Tech, he would undergo a disciplinary process. What Plaintiff did not know—and what ULS failed to inform her—is that Silva remained in ULS's control at ULL. ULL failed to initiate any disciplinary procedures against Silva.

Plaintiff testified that she learned this fact in Jacoby's May 26, 2021 article:

> When I found out that he had resigned from Louisiana Tech and reenrolled at ULL and graduated with a clean record, I felt that he had not been held accountable in any way for what he had done to me. I had trusted that the people who I told who were officials in this case – that they were doing what needed to be done behind the scenes to hold him accountable for what it is that I had reported. And so when I found out later via the Kenny Jacoby article that – that actually, seemingly, he – he had kind of gotten off scot-free, that – that was a real, I think, blow to me and to – it confirmed to me that people would not believe me, is what it felt like, that they would not believe what – what had happened to me and that they would not – at least if they had believed me, that they would not take it as seriously as I had taken it.

(Doc. 193-47 at 312:24–313:15). Although Plaintiff and Jacoby had discussions before the article was published, Plaintiff testified that Jacoby was "very careful to keep the rest of the content of the article from me [Plaintiff]." She also testified that she "can

clearly recall that it was after the article came out when I read it that I realized everything or saw everything about the universities." (Doc. 193-71 at 29:4–9).

Tech apparently learned that it failed to place a hold on Silva's transcript, as required by Act 172, in response to Jacoby's *USA Today* article, too. In a string of emails sent amongst Tech administrators after reading Jacoby's *USA Today* article on the day that it was published, May 26, 2021, Tech Assistant Vice President for Student Advancement Crawford admitted that Tech should have placed a hold on Silva's transcript. (Doc. 193-65). Also on May 26, Tech placed a hold on Silva's transcript.

The Court pauses to emphasize that it finds it absurd that ULS attempts to charge Plaintiff, an alleged rape victim and student, with a duty to investigate Silva's whereabouts at another ULS institution, while simultaneously asking the Court to absolve it of same. ULS argues that "[a]wareness' [of the existence of the injury and causation] . . . does *not* mean actual knowledge; rather, all that must be shown is the existence of 'circumstances [that] would lead a reasonable person to investigate further.'" (Doc. 198-1 at 25). Accordingly, ULS asserts that a reasonable person in Plaintiff's shoes should have investigated further and should have known of the facts underlying her post-report claim before Jacoby's May 26, 2021 *USA Today* article.

Meanwhile, Tech itself did not investigate, much less acknowledge that it should have placed a hold on Silva's transcript, or that it failed to place a hold on Silva's transcript, until Tech administrators read Jacoby's USA Today article on May 26, 2021.

53

ULS even asks the Court to find that it owed no duty to Plaintiff, a Tech student who reported to Tech that she was raped by another Tech student, because Silva resigned before Tech could meaningfully discipline him, although Silva was back in ULS's control as soon as winter break ended. ULS dismissively describes Silva's alleged rape of Plaintiff as "a bad experience with a man who seems to be a person of ill-repute." (Doc. 204-1).

Based on these facts, the Court finds that a reasonable jury could conclude that Plaintiff's post-report claim is not time-barred. Tech affirmatively represented to Plaintiff that there was nothing it could do regarding her report that Silva raped her, released Silva's transcript to ULL, and concealed the fact that Silva was still under ULS's control at ULL.

ULS's cited cases do not persuade otherwise. These cases draw a clear distinction between deliberate indifference or inaction that was *concealed* from the plaintiff and inaction that was patently clear to the plaintiff. In *Lozano v. Baylor University*, for example, plaintiff notified Baylor University officials and the Waco Police Department that she had been assaulted numerous times by a Baylor football player from March 2014 until January 2015, but plaintiff's abuser was permitted to remain at the University—and on the football team—until an unrelated criminal charge in March 2016. 408 F. Supp. 3d. 861, 875–877 (W.D. Tex. 2019). Because the period of inaction by the university stretched nearly two years, the court found it reasonable to dismiss plaintiff's post-report claim as time barred. *Id*. at n.5. Put another way, because Plaintiff knew her abuser remained on campus and

presumably knew that Baylor did not properly handle her report, yet did nothing more, her claim was deemed to be prescribed.

Similarly, in *Doe 12 v. Baylor University*, the court found the University's failure to respond in any manner to plaintiff's three separate reports of sexual assaults filed between April 2012 and November 2014 made plaintiff "aware that she received a deliberately indifferent response" such that her claim was time-barred. 336 F. Supp. 3d 763, 785 (W.D. Tex. 2018). After assaulting Doe 13 on Baylor's campus in Fall 2012, Doe 13's abuser was permitted to "follow" her onto a study abroad program and continue to assault her in Fall 2014. *Id.* at 771. That Doe 13 knew that her abuser both remained at Baylor and continued to enroll in the same academic programs as Doe 13 presumably put Doe 13 on notice that her report had not been properly handled. Her claim, too, was thus prescribed.

In *Owens v. Louisiana State University*, plaintiffs alleged that Louisiana State University failed to adequately respond to a variety of Title IX violations reported between 2009 and 2020. The *Owens* plaintiffs' port-report claims were similarly dismissed because the Court found that evidence of the university's inaction was clear and obvious to plaintiffs. 666 F. Supp. 3d 561, 575 (M.D. La. 2023) ("Plaintiffs would have understood that the Board's deliberate indifference to their reports was the cause of their post-reporting injuries . . . or [p]laintiffs could reasonably have been expected to inquire further."). The Court dismissed the *Owens* plaintiffs' post-report claims because they did not demonstrate that the university "engaged in affirmative acts of concealment, or that that [the university] affirmatively lulled Plaintiffs into

inaction or perpetrated some trick or contrivance tending to exclude suspicion and prevent inquiry such to excuse late filing." *Doe #1 v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll., et al.*, 2022 WL 16701930 at *15 (M.D. La. 2022).

Here, to the contrary, Plaintiff reported Silva's alleged rape to Tech, Tech PD, and Ruston PD. Tech administrators affirmatively told Plaintiff that there was nothing they could do regarding her report because Silva was no longer a Tech student. Silva was no longer on Tech's campus. Meanwhile, Tech knowingly released Silva's transcript to ULL, ULS allowed Silva to re-enroll and ultimately graduate from ULL, and ULS failed to ever pursue disciplinary action against Silva, despite the fact that Silva remained under ULS's disciplinary authority. According to Plaintiff, she only learned that Silva re-enrolled at ULL and graduated with a clean record when Jacoby published his article on May 26, 2021. A reasonable jury could find that ULS engaged in affirmative acts of concealment to prevent Plaintiff from knowing that ULS failed to take her report seriously.

The Court finds that a genuine issue of material fact precludes summary judgment on the issue of whether Plaintiff's post-report claim against ULS is time-barred.

### ii. Whether Plaintiff Satisfies the Elements of Her Post-Report Claim.

Alternatively, ULS contends that Plaintiff cannot prove the elements of her post-report claim, which mirror the elements of her heightened risk claim. ULS argues that Plaintiff cannot show that: (1) Tech had control over Silva and the

location of the harassment; (2) Silva's alleged rape barred her from educational opportunities or benefits; and (3) Tech was deliberately indifferent.

> ### a. Whether Tech Had Control Over Tech Student's Alleged Rape of Another Tech Student When the Alleged Rape Occurred in Off-Campus Apartment and the Tech Student Resigned Three Days After Rape Report.

ULS contends that it did not have control over the location of the harassment because the rape occurred off-campus. (Doc. 198-1 at 33). The Court already addressed and disposed of this argument. *Doe v. Bd. of Supervisors of Univ. of La. Sys.*, 650 F. Supp. 3d 452, 468 (M.D. La. 2023) ("ULS lacks any authority for the broad proposition that Title IX does not apply when student rape occurs off-campus. By contrast, multiple courts have found that off-campus rape and assault is actionable, particularly when the university is actually aware of prior assaults by the same student-attacker.") (citing *Hernandez v. Baylor Univ.*, 274 F. Supp. 3d 602, 610–612 (W.D. Tex. 2017) (student-plaintiff stated actionable heightened risk and post-reporting claims based on sexual assault that occurred at "an off-campus party," where the university knew of prior reports of sexual assault committed by the same student-attacker); *Farmer v. Kansas State Univ.*, 918 F.3d 1094, 1097 (10th Cir. 2019) (actionable Title IX claims based on rapes occurring at off-campus fraternity houses and vehicles); *Lozano v. Baylor Univ.*, 408 F. Supp. 3d 861, 883 (W.D. Tex. 2019) (actionable Title IX claims based on assaults occurring at off-campus apartment and a restaurant parking lot); *Doe 1 v. Baylor Univ.*,

240 F. Supp. 3d 646, 654 (W.D. Tex. 2017) (actionable Title IX claims based on sexual assault occurring "at a house near campus")).

ULS also contends that it did not have control over Silva because Silva resigned from Tech three days after Plaintiff reported the rape before Tech could open a meaningful investigation regarding Silva. This argument also fails. It is undisputed that Silva re-enrolled at ULL, also under ULS's control, less than one month from the date of Plaintiff's report to Tech.

### b. Whether Plaintiff's Alleged Rape Barred Educational Opportunities or Benefits.

ULS contends that because Plaintiff successfully graduated with honors from Tech, her alleged rape did not deprive her from any educational opportunity or benefit. (Doc. 198-1 at 33). Again, the Court already emphatically disposed of this argument. On ULS's Motion to Dismiss, the Court held: "Unquestionably, rape is severe and objectively offensive sexual harassment sufficient to support an actionable Title IX claim, *even in the absence* of allegations that a plaintiff's academic track was thrown off course." *Doe v. Bd. of Supervisors of Univ. of La. Sys.*, 650 F. Supp. 3d 452, 469–70 (M.D. La. 2023) (citing *Kelly v. Yale Univ.*, No. 01-cv-1591, 2003 WL 1563424, at *3 (D. Conn. Mar. 26, 2003) (Hall, J.) ("There is no question that a rape . . . constitutes severe and objectively offensive sexual harassment under the standard set forth in *Davis*"); *Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999) (Rape "obviously qualifies as severe, pervasive, and objectively offensive sexual harassment that could deprive [the victim] of access to the educational opportunities provided by her school"); *Doe through Doe v. Brighton Sch. Dist. 27J*, No. 19-cv-0950,

58

612 F. Supp. 3d 1205, 1211 (D. Colo. Feb. 24, 2020) (Martinez, J.) ("[A] single, serious sexual assault can meet the severe, pervasive, and offensive standard.") (additional citations omitted)).

### c. Whether Tech was Deliberately Indifferent.

Again, based on the lengthy facts in the record, a reasonable jury could find that ULS was deliberately indifferent for the purpose of Plaintiff's post-report claim. ULS's Motion for Summary Judgment (Doc. 198) regarding Plaintiff's post-report claim is **DENIED**.

### C. Plaintiff's Negligence Claims Against ULS.

ULS argues that it is entitled to summary judgment on Plaintiff's negligence claim because it is immune from suit, it owed no duty to Plaintiff, and it did not breach any duty. The Court will address each argument in turn.

### i. ULS is Not Entitled to Immunity.

ULS claims that it is immune from suit based on Plaintiff's state law negligence claim for two reasons. First, ULS argues that it is entitled to absolute or qualified immunity from liability under Louisiana Revised Statutes § 9:2798.1. (Doc. 198-1 at 36–37). Second, ULS argues that, as an arm of the state, it is immune from Plaintiff's suit in this Court based on state law. (*Id.* at 36).

### a. ULS is Not Entitled to Absolute Immunity.

Without any supporting reasons, ULS argues it is entitled to "absolute and/or qualified immunity[.]" (Doc. 198-1 at 38). Plaintiff responds that ULS is not entitled

to absolute immunity, which applies to the President, legislators, and judges, acting in their official capacities. (Doc. 210 at 35, n. 26).

"Government officials to whom absolute immunity is extended include judges performing judicial acts within their jurisdiction, prosecutors in the performance of their official functions, and certain 'quasi-judicial' agency officials who, irrespective of their title, perform functions essentially similar to those of judges or prosecutors, in a setting similar to that of a court." *Nguyen v. La. State Bd. of Cosmetology*, 227 F. Supp. 3d 615, 621–22 (M.D. La. 2016) (internal quotation marks omitted). ULS makes no argument indicating that it falls into this category. Accordingly, the Court finds ULS is not entitled to absolute immunity. ULS's Motion for Summary Judgment (Doc. 198) is **DENIED** in this respect.

### b. ULS is Not Entitled to Qualified Immunity.

ULS asserts that it is subject to qualified immunity under Louisiana Revised Statutes § 9:2798.1 because the facts show that there is no evidence of "criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct" by ULS. (Doc. 198-1 at 36). Plaintiff responds that ULS's bald assertion that it is entitled to discretionary immunity lacks any meaningful analysis and should be rejected. (Doc. 210 at 9–10). Plaintiff further contends that ULS is not entitled to discretionary function immunity because ULS's responsibilities under Act 172 and the MOU were not discretionary. (*Id.* at 45–46).

Louisiana Revised Statutes § 9:2798.1 provides in relevant part:

B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to

exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.

C. The provisions of Subsection B of this Section are not applicable:

(1) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policymaking or discretionary power exists; or

(2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.

La. Rev. Stat. § 9:2798.1.

The Court analyzed this issue at the Motion to Dismiss phase and emphasized that when "a statute, regulation, or policy prescribes a particular course of action, there is no choice or discretion involved, and the immunity does not apply." *Doe v. Bd. of Supervisors of Univ. of La. Sys.*, 650 F. Supp. 3d 452, 482 (M.D. La. 2023) (citing *Doe v. ABC Sch.*, 2019-0983 (La. App. 1st Cir. 12/17/20), 316 So. 3d 1086, 1099, *writ denied*, 2021-00098 (La. 3/9/21), 312 So. 3d 582) (discretionary act immunity did not apply to school board's failure to conduct criminal background check of janitor that sexually assaulted student because "[t]he School Board's independent liability was not at the policy making or ministerial level but rather at the operational level for which no immunity applies"). The Court held that LCG was not entitled to discretionary immunity because LCG lacked discretion under the law and the MOU. *Doe*, 650 F. Supp. 3d at 482. Similarly, Act 172 imposed non-discretionary duties on ULS. Coupled with the fact that whether ULS's conduct was "criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant" remains at issue, ULS is not entitled to qualified immunity for discretionary acts under

Louisiana Revised Statutes § 9:2798.1. ULS's Motion for Summary Judgment (Doc. 198) is **DENIED** in this respect.

### c. The Court Need Not Address Sovereign Immunity.

ULS contends that if the Court dismisses Plaintiff's Title IX claims against ULS, then Plaintiff's negligence claims should be dismissed and litigated in state court because it is entitled to sovereign immunity on Plaintiff's state law claims. (Doc. 219 at 20). Because the Court has not dismissed Plaintiff's Title IX claims, the Court need not address this argument.

### ii. Whether Plaintiff's Negligence Claim Is Time-Barred.

ULS contends that Plaintiff's negligence claims are time barred because Plaintiff had actual and constructive knowledge of her claims years before she filed suit. (Doc. 198-1 at 37). ULS argues that Plaintiff filed suit on May 25, 2022, and was assaulted in September 2018. (*Id.* at 38). ULS contends that Plaintiff had sufficient knowledge regarding Silva's full name and the fact that he sexually assaulted other women no later than December 11, 2018, when a sorority post identified "Victor Daniel Silva" as a serial rapist and warned women to stay away from him. (*Id.*). ULS argues that even a "generous analysis of prescription" indicates that Plaintiff should have filed suit by December 2021, a year after Plaintiff granted Jacoby an interview for his reporting. (*Id.* at 41–42).

Plaintiff responds that she has unequivocally testified that she did not know the material facts underlying her claims until she read Kenny Jacoby's article, and there is nothing in the record that contradicts her consistent and credible testimony

on this issue. (Doc. 210 at 10). The Court, however, cannot evaluate credibility on summary judgment.

The Court has already engaged in an in-depth analysis of the timeliness of Plaintiff's claims. For the same reasons set forth above concerning the timeliness of Plaintiff's post-report claim, a genuine issue of material fact precludes summary judgment concerning whether Plaintiff's negligence claim was timely.

### iii.    Whether ULS Owed and Breached a Duty.

ULS contends that it owed no duty to Plaintiff. ULS further contends that it is "unfathomable" for Plaintiff to claim that it was foreseeable that Silva's 2015 forcible rape arrest could lead to Silva's 2018 alleged rape of Plaintiff. (Doc. 198-1 at 43). ULS asserts: "Simply put, there was no duty owed and no duty breached that would have had any impact on Plaintiff's allegations of sexual assault." (*Id*. at 45).

The Court has already held: "Plainly, when assessing this claim, Act 172 may be consulted to determine the source and scope of ULS's duty to Plaintiff." *Id*. (internal citations omitted). The undisputed facts in the record indicate that Act 172 dictated ULS's duties to its students. In short, ULS owed a duty to Plaintiff, a Tech student.

The record is replete with facts from which a reasonable jury could find that ULS breached that duty. ULS can present its arguments to the jury and let the jury decide whether it was negligent. ULS's Motion for Summary Judgment (Doc. 198) is **DENIED.**

**D. Damages.**

ULS asks the Court to find that even if Plaintiff prevails on her Title IX claims, she is not entitled to emotional damages. (Doc. 198-1 at 46). Plaintiff responds that she did not request emotional injury damages on her Title IX claims, making this a moot point. (Doc. 210 at 52). Because Plaintiff does not seek emotional distress damages, the Court need not address it here.

ULS also asks the Court to find that even if Plaintiff prevails on her negligence claims, she cannot recover damages for past or future medical treatment. ULS cites no authority for its argument other than its own Motion in Limine, which the Court has denied. (Doc. 198-1 at 46; Doc. 160; Doc. 259). The Court will not preclude Plaintiff from seeking damages for medical treatment on this sparse basis alone.

**E. Comparative Fault.**

ULS argues that Silva and LSU's fault must be considered at trial. (Doc. 198-1 at 46–47). This request appears to bear on the evidence that may be introduced at trial rather than one requiring disposition at the summary judgment stage. Accordingly, the Court will address this separately in its forthcoming Rulings on the pending evidentiary motions.

V.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant Board of Supervisors of the University of Louisiana System's **Motion for Summary Judgment (Doc. 198)** is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff Jane Doe's **Motion for Partial Summary Judgment (Doc. 193)** is **GRANTED.**

Baton Rouge, Louisiana, this 18th day of July, 2025

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**